**Stephanie M. GARZA, Appellant,**

v.

**Xavier H. GARZA, Appellee.**

**No. 04–03–00888–CV.**

Court of Appeals of Texas,
San Antonio.

Oct. 11, 2006.

Rehearing Overruled Dec. 4, 2006.

See also 155 S.W.3d 471.

James E. Hoffman, Per A. Hardy, Law Office of Per A. Hardy, San Antonio, for appellant.

Beth Watkins Squires, Law Office of Beth Squires, Michael W. Jackson, Law Office of Michael W. Jackson, Jo Chris G. Lopez, Shaddox, Compere, Walraven & Goode, P.C., San Antonio, for appellee.

Wade B. Shelton, Shelton & Valadez, P.C., San Antonio, for other.

Sitting: SARAH B. DUNCAN, Justice, KAREN ANGELINI, Justice, PHYLIS J. SPEEDLIN, Justice.

## OPINION

Opinion by KAREN ANGELINI, Justice.

Stephanie Garza appeals the final decree of divorce and brings the following issues on appeal: (1) whether the trial court awarded a disproportionate division of the property to Xavier Garza by improperly characterizing community assets as Xavier Garza's separate property; (2) whether the

trial court disregarded the commingling of community and separate property; (3) whether the trial court should have applied the doctrines of judicial admission and judicial estoppel with respect to Xavier Garza's testimony; (4) whether the trial court should have "disregarded the corporate fiction of Hacienda Tile, Inc."; (5) whether the trial court applied the incorrect burden of proof regarding community and separate property and ignored the presumption that all property acquired during the marriage is community; (6) whether the trial court should have denied Stephanie Garza's claims based on fraud, breach of fiduciary duty, and reimbursement; (7) whether the trial court ordered periods of possession and the rights and duties of the parties based on Xavier Garza's request instead of the best interest of the children; (8) whether the trial court erred in admitting Stephanie Garza's medical records in evidence; (9) whether the trial court erred in allowing Xavier Garza to play an audiotape recording to the jury while excluding Stephanie Garza's audiotape; (10) whether the trial court erred in failing to ensure that a complete reporter's record was made; and (11) whether the trial court erred in admitting in evidence Xavier's testimony about documents not produced in discovery. We affirm in part and reverse and remand in part.

## BACKGROUND

Xavier and Stephanie Garza were married on March 9, 1996. Their first son was born in 1997, and their second son was born in 1999. Both children have various medical conditions requiring special attention. Before the marriage, Stephanie Garza was employed as a teacher, but soon after the wedding and the birth of her and Xavier's first son, she stayed at home to take care of the children.

Throughout their marriage, Xavier Garza was the primary financial provider for the family. A year before the wedding, in 1995, he created a corporation called Hacienda Tile, Inc. He created Hacienda Tile, Inc., a subcontracting company, for the purpose of installing ceramic and stone tiles. Xavier Garza and his father were the only members of the board of directors, and Xavier was the sole shareholder. In 1998, after the wedding, Xavier Garza expanded his business and began to purchase land and construct custom homes under the name "Hacienda Homes."

On January 25, 2002, Xavier Garza filed for divorce. During their separation, both Xavier and Stephanie spent an equal amount of time with the children. However, on August 20, 2003, in the final divorce decree, although Xavier and Stephanie were appointed joint managing conservators, Xavier Garza was awarded the exclusive right to determine the children's primary residence, the exclusive right to consent to their medical treatment, and the exclusive right to make decisions about their education. Xavier Garza was given a superior right to possess the children. Stephanie Garza was awarded possession of the children pursuant to a possession order that deviated from the standard possession order, and she was ordered to provide health insurance for the children and to pay $232.00 per month in child support.

With regard to the division of property, the trial court found that the parties had $147,742.00 in equity in their community homestead. The trial court awarded the homestead to Xavier Garza and ordered him to pay Stephanie the principle sum of $73,871.00 plus annual interest of 6% in 60 monthly payments of $1,428.13. The court determined that Hacienda Tile, Inc. a/k/a Hacienda Homes and all assets, property, and accounts related to or used in connec-

tion with this business were Xavier Garza's separate property. The court also determined that several shares of stock, jewelry, and various household items were Stephanie's separate property.

### REIMBURSEMENT CLAIMS

According to Stephanie Garza, the trial court abused its discretion in denying her reimbursement claims regarding the following: (1) Xavier Garza's house in Austin; (2) Xavier's 1972 Oldsmobile Cutlass; and (3) legal fees paid by Xavier relating to his daughter from his previous marriage.

■■■ "The rule of reimbursement is purely an equitable one." *Vallone v. Vallone*, 644 S.W.2d 455, 458 (Tex.1982). A right of reimbursement arises when the funds or assets of one estate are used to benefit and enhance another estate without itself receiving some benefit. *Id.* at 459. A right of reimbursement also arises when community time, talent, and labor are used "to benefit and enhance a spouse's separate estate, beyond whatever care, attention, and expenditure are necessary for the proper maintenance and preservation of the separate estate, without the community receiving adequate compensation." *Id.*

■■■ A party claiming the right of reimbursement must plead and prove that the expenditures and improvements were made and that they are reimbursable. *Id.; Hailey v. Hailey*, 176 S.W.3d 374, 384 (Tex.App.-Houston [1st Dist.] 2004, no pet.). "Whether the situation involves the payment of a purchase money debt or a capital improvement, the enhancement value is the measure of reimbursement." *Zeptner v. Zeptner*, 111 S.W.3d 727, 735 (Tex.App.-Fort Worth 2003, no pet.) (citing *Penick v. Penick*, 783 S.W.2d 194, 197 (Tex.1988)). The enhanced value of separate property is the difference between the fair market value before and after any improvements made by the community

during the marriage. *Rogers v. Rogers*, 754 S.W.2d 236, 239 (Tex.App.-Houston [1st Dist.] 1988, no writ); *see also Anderson v. Gilliland*, 684 S.W.2d 673, 675 (Tex.1985).

■■■ Reimbursement is not available as a matter of law, but lies within the discretion of the court. *Vallone*, 644 S.W.2d at 459; *Zeptner*, 111 S.W.3d at 735. In evaluating the merits of a claim for reimbursement, the trial court should consider "all the facts and circumstances and determine what is fair, just, and equitable." *Penick v. Penick*, 783 S.W.2d 194, 197 (Tex.1988); *see also Zeptner*, 111 S.W.3d at 735. The trial court should not simply return to the spouse seeking reimbursement the actual amount advanced to the other spouse's separate estate without regard to the benefits received in turn by the community estate. *Penick*, 783 S.W.2d at 197–98; *Zeptner*, 111 S.W.3d at 735. An "equitable claim for reimbursement is not merely a balancing of the ledgers between the marital estates." *Penick*, 783 S.W.2d at 198.

### A. The Austin House

■■■ According to Stephanie Garza, she is entitled to reimbursement for the increased value during the marriage of Xavier Garza's rental house in Austin "in the amount of $135,000.00 and reimbursement for the value of the time, toil and effort expended by the community estate on the property." Stephanie complains that Xavier would go once a month to check up on the house and make repairs to the house, including painting the house, installing new tile floors, and repairing the water heater and plumbing. However, as mentioned above, the community is only entitled to reimbursement when the community's time, talent, and labor are used to benefit and enhance a separate estate *be-*

yond whatever care, attention, and expenditure are necessary for the proper maintenance and preservation of the separate estate. *Vallone*, 644 S.W.2d at 459. Here, the trial court was within its discretion in finding that Xavier's time, talent, and labor were reasonably necessary in maintaining and preserving the Austin rental property.

▮ Stephanie also emphasizes that Xavier had repairs made to the foundation totaling approximately $2,000.00. However, no evidence was offered to show that this *repair* was a capital *improvement* to the house. *See Bell v. Bell*, No. 12–04–00244–CV, 2005 WL 1538275, at *7 (Tex. App.-Tyler June 30, 2005, no pet.) (memo. op.) (holding that husband was not entitled to reimbursement because there was no evidence that repairing septic system to house owned by wife separately was a capital improvement to the septic system or the home). And, even if we assume that the repairs were a capital improvement, the appropriate measure of reimbursement would be the enhanced value of Xavier's house as a result of those expenditures. *See id.* However, the only evidence in the record regarding the value of Xavier's house was his testimony that, to the best of his knowledge without doing an appraisal, the house was worth $270,000.00. There was no evidence about the fair market value of the home before the repairs were made. Accordingly, we hold that the trial court, in failing to award Stephanie's reimbursement claim regarding Xavier's house in Austin, did not abuse its discretion. *See Zeptner*, 111 S.W.3d at 737 (holding that trial court did not abuse its discretion by refusing to award reimbursement to the community for improvements to property when no evidence was offered to prove the value of the property before improvements); *see also Bell*, 2005 WL 1538275, at *7.

### B. 1972 Oldsmobile Cutlass

▮ Stephanie also claims entitlement to reimbursement for the enhanced value and the community funds expended to restore Xavier's 1972 Oldsmobile Cutlass. Xavier purchased the vehicle before the marriage, and the trial court confirmed it as his separate property. With regard to the value of the car, Stephanie relies solely on her own testimony that she believed Xavier purchased the vehicle for $4,000.00 and that the current value of the vehicle was $9,000.00 "according to Xavier's inventory." Thus, according to Stephanie, she is entitled to the enhanced value of the vehicle. However, Stephanie failed to present evidence that the alleged enhancement in value was actually due to the renovations made to the car. *See Zeptner*, 111 S.W.3d at 737. Therefore, the trial court did not abuse its discretion in denying her reimbursement claim for the restoration of Xavier's car.

### C. Legal Fees

▮ Stephanie also argues that she is entitled to reimbursement of $25,000.00 in community funds used to pay for legal fees relating to the SAPCR suit Xavier brought to gain custody of his daughter from a previous marriage. Spouses, however, are free to make expenditures of community property absent some deception or objection by the other spouse. *See Pelzig v. Berkebile*, 931 S.W.2d 398, 400 (Tex.App.-Corpus Christi 1996, no writ) (finding no abuse of discretion by trial court in failing to award reimbursement to wife for attorney's fees expended by husband with regard to his first divorce because payments appeared to have been made with wife's full knowledge and tacit consent, and "[w]hile these payments may not have been strictly obligatory in the sense [of] court-ordered payments . . . , it should be remembered that spouses are

free to make expenditures of community property absent some deception or objection by the other spouse"). Here, there was evidence that these payments in legal fees were made by Xavier with Stephanie's full knowledge and implicit consent. *See id.* There is no evidence that these expenses benefitted Xavier's separate estate or that Stephanie was deceived about these payments or objected to them. *See id.* In fact, Stephanie testified that she knew Xavier had looked for an attorney, had hired one, and had begun the proceedings. Moreover, Xavier testified that he took out a loan from Hacienda Tile, Inc. in the amount of more than $25,000 to pay for the SAPCR, and that he had not yet repaid Hacienda for that obligation.

Given that reimbursement is an equitable remedy within the discretion of the trial court and not available as a matter of law, we find no abuse of discretion on the part of the trial court.

## MISCHARACTERIZATION OF PROPERTY/COMMINGLING

According to Stephanie Garza, the trial court improperly characterized three real properties as Xavier Garza's separate property. During the marriage, Xavier Garza purchased three lots and, after constructing a spec home on each lot, sold them to interested buyers under the name of "Hacienda Homes." According to Stephanie Garza, the trial court erred in finding that these three real properties were Xavier's separate property because he failed to overcome the community property presumption by clear and convincing evidence. We agree.

▆▆▆ Under Texas law, property possessed by either spouse during or on dissolution of marriage is presumed to be community property. *See* TEX. FAM.CODE ANN. § 3.003 (Vernon 1998). To overcome this presumption, a party must present

clear and convincing evidence that the property is separate. *Id.* Clear and convincing evidence is defined as that "measure or degree of proof which will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007.

▆▆▆ To overcome the community presumption, the spouse claiming certain property as separate has the burden to trace and clearly identify the property claimed to be separate. *Boyd v. Boyd,* 131 S.W.3d 605, 612 (Tex.App.-Fort Worth 2004, no pet.). Tracing involves establishing the separate origin of the property through evidence showing the time and means by which the spouse originally obtained possession of the property. *Id.; Ganesan v. Vallabhaneni,* 96 S.W.3d 345, 354 (Tex.App.-Austin 2002, pet. denied). And, as a general rule, mere testimony that property was purchased with separate funds, without any tracing of the funds, is insufficient to rebut the community presumption. *Schmeltz v. Garey,* 49 Tex. 49, 60–61 (1878); *Boyd,* 131 S.W.3d at 612; *Zagorski v. Zagorski,* 116 S.W.3d 309, 316 (Tex.App.-Houston [14th Dist.] 2003, pet. denied) (op. on reh'g); *Bahr v. Kohr,* 980 S.W.2d 723, 728 (Tex.App.-San Antonio 1998, no pet.); *McElwee v. McElwee,* 911 S.W.2d 182, 188 (Tex.App.-Houston [1st Dist.] 1995, writ denied). Any doubt as to the character of property should be resolved in favor of the community estate. *Boyd,* 131 S.W.3d at 612. Further, if the evidence shows that separate and community property have been so commingled as to defy resegregation and identification, the community presumption prevails. *Id.*

▆▆▆ We review a trial court's division of property for abuse of discretion. *Moroch v. Collins,* 174 S.W.3d 849, 857 (Tex.App.-Dallas 2005, pet. denied); *see*

*Murff v. Murff,* 615 S.W.2d 696, 699 (Tex. 1981); *Brock v. Brock,* 192 S.W.3d 895, 896 (Tex.App.-Dallas 2006, no pet. h.). A trial court does not abuse its discretion if there is some evidence of a substantive and probative character to support the decision. *Moroch,* 174 S.W.3d at 857; *LaFrensen v. LaFrensen,* 106 S.W.3d 876, 878 (Tex. App.-Dallas 2003, no pet.). Further, we review a trial court's findings for legal and factual sufficiency. *Moroch,* 174 S.W.3d at 857; *see Catalina v. Blasdel,* 881 S.W.2d 295, 297 (Tex.1994). Because in family law cases the abuse of discretion standard of review overlaps with the traditional sufficiency standards of review, legal and factual insufficiency are not independent grounds of reversible error; instead they constitute factors relevant to our assessment of whether the trial court abused its discretion. *Moroch,* 174 S.W.3d at 857; *Boyd,* 131 S.W.3d at 611. Therefore, in considering whether the trial court abused its discretion because the evidence is legally or factually insufficient, we apply a two-prong test: (1) did the trial court have sufficient evidence upon which to exercise its discretion, and (2) did the trial court err in its application of that discretion? *Moroch,* 174 S.W.3d at 857; *Boyd,* 131 S.W.3d at 611. We then consider whether, based on the evidence, the trial court made a reasonable decision. *Moroch,* 174 S.W.3d at 857; *Boyd,* 131 S.W.3d at 611.

 Further, if the trial court mischaracterized the property and that mischaracterization affected the just and right division of the community estate, we must remand the entire community estate for a just and right division based upon the correct characterization of the property. *Jacobs v. Jacobs,* 687 S.W.2d 731, 733 (Tex. 1985); *Boyd,* 131 S.W.3d at 617; *Zeptner,* 111 S.W.3d at 740; *Robles v. Robles,* 965 S.W.2d 605, 615 (Tex.App.-Houston [1st Dist.] 1998, pet. denied). If, on the other hand, the mischaracterization of the property had only a *de minimis* effect on the trial court's just and right division, then we need not remand the cause to the trial court. *Boyd,* 131 S.W.3d at 617; *Robles,* 965 S.W.2d at 615.

 During Stephanie and Xavier's marriage, Xavier Garza bought three lots: Lot 480, Lot 481, and Lot 482. The documents entered in evidence show that Xavier Garza purchased the lots in his individual name. With respect to Lot 482, when Xavier bought the lot, the warranty deed listed "Xavier H. Garza" as grantee along with Xavier's home address. And, when Xavier Garza sold the spec home and lot in 2000, the general warranty deed listed Xavier Garza in his individual name as "a married person." Further, the settlement statement lists Xavier in his individual name along with his home address. There is no mention of Hacienda Tile, Inc. anywhere on these documents. At trial, Xavier Garza testified that in purchasing this lot, he was acting as an agent of Hacienda Tile, Inc. and points to Hacienda Tile's federal tax number being listed on the settlement statement. He also testified that he purchased the lot with funds from Hacienda Tile's business account in the amount of $50,000. However, he was unable to produce any documentation supporting his testimony. According to Xavier, all his documents had been destroyed in a flood.

Similarly, with respect to Lot 481, when Xavier Garza bought the lot, the earnest money contract listed him in his individual name as the "Buyer" along with home address. The warranty deed also listed "Xavier Garza" as "grantee." However, the "grantee's mailing address" was Xavier's business address. Likewise, the settlement statements lists Xavier in his individual name but lists his business address. Again, no mention is made of Hacienda

Tile, Inc. And, although Xavier entered into the earnest money contract in his individual name, with his home address listed, he emphasizes that he was able to trace the earnest money from Hacienda Tile, Inc. through Hacienda Tile's business ledger. Indeed, through the business ledger, Xavier was able to trace a payment of five hundred dollars from Hacienda Tile's operating account (check # 1020) to "Kendall Co. Abstract." This payment of five hundred dollars was reflected on the earnest money contract through a handwritten notation that the seller had received check # 1020 in the amount of five hundred dollars.

Xavier Garza financed the construction for both spec homes through MG Building Material ("MG Building"), a financing company, by giving it security interests in the lots. Xavier obtained the loans from MG Building in his individual name, without reference to Hacienda Tile, Inc. or Hacienda Homes. When asked who applied for interim financing from MG Building, Xavier stated, "I did." He explained, "The relationship I had with MG Building Material was just a handshake and a good relationship." Although the financing was in his individual name, Xavier emphasizes that if construction costs for the houses went over the budget financed by MG Building, the rest of the funds came directly from Hacienda Tile, Inc.'s account. However, he was not able to produce any documentation at trial to show such an arrangement. Xavier further emphasizes his testimony that he never received any checks from MG Building personally. Instead, according to Xavier, MG Building wrote checks directly to the subcontractors working on the house or to Hacienda Tile, Inc.

Once the construction of the spec homes was completed, Xavier Garza advertised them for sale under the name "Hacienda Homes." However, the deeds for the houses were in Xavier's individual name; they were not under the name Hacienda Tile, Inc. or Hacienda Homes. Although the deeds were in Xavier's individual name, the proceeds from the sale of the houses went into Hacienda Tile's checking account.

Like the two other lots, the warranty deed for Lot 480 lists Xavier Garza in his individual name as the grantee. However, it lists his business address as the "mailing address." The settlement statement lists "Xavier Garza" in his individual name but also lists his business address.

After he initially bought Lot 480, he transferred by warranty deed Lot 480 to Hacienda Tile, Inc. for the consideration of ten dollars. According to Xavier's testimony, he could no longer get financing from MG Building, and his new lender, Union Bank, demanded the lot be put in the corporation's name. Xavier also testified that the purchase price of the lot in the amount of $70,750 was loaned to him by a family friend. However, he was unable to produce the note at trial because it had been destroyed in the flood. And, he was unable to obtain a copy of the note from his friend. Nevertheless, according to Xavier's testimony, the loan was the corporation's loan, and it was reflected on the balance sheet and on the financial statement. Xavier further testified that once construction was completed, he was unable to sell the spec house for about eight or nine months due to disadvantageous market conditions and finally sold the home at a loss.

■■■ On appeal, Stephanie Garza argues that Xavier failed to overcome the community property presumption. We agree. The characterization of property as either community or separate is determined by the inception of title to the property. *Boyd v. Boyd*, 131 S.W.3d 605, 612

(Tex.App.-Fort Worth 2004, no pet.); *Smith v. Smith*, 22 S.W.3d 140, 145 (Tex. App.-Houston [14th Dist.] 2000, no pet.) (*op. on reh'g*). Inception of title occurs when a party first has a right to claim the property by virtue of which title is finally vested. *Boyd*, 131 S.W.3d at 612; *Smith*, 22 S.W.3d at 145. Here, the earnest money contracts for all three lots were entered into during the marriage. *See Wierzchula v. Wierzchula*, 623 S.W.2d 730, 732 (Tex. Civ.App.-Houston [1st Dist.] 1981, no writ) (holding that inception of title occurred when earnest money contract was signed). With regard to all three lots, the earnest money contracts, the deeds, and the settlement statements were in Xavier Garza's individual name. The financing was in his individual name. And, although Xavier testified that the funds to purchase the lots came from Hacienda Tile, Inc., besides one check for $500.00, he could not produce any financial statements tracing the funds to Hacienda Tile. *See Boyd*, 131 S.W.3d at 612. Therefore, the trial court's finding that the spec homes were Xavier's separate property was not supported by factually sufficient evidence. And, as the spec homes were a substantial portion of the community estate, the trial court's mischaracterization of the spec homes affected the just and right division of the community estate, constituting an abuse of discretion. As such, we remand the entire community estate for a just and right division based upon the correct characterization of the property.

### OTHER ISSUES

Stephanie Garza also argues the following:

(1) the trial court should have granted her reimbursement claim with respect to the three spec homes;

(2) the trial court should have applied the doctrines of judicial admission and judicial estoppel to exclude evidence contrary to Xavier Garza's prior sworn testimony regarding the ownership of Lots 480, 481, and 482;

(3) the trial court should have disregarded the corporate fiction, because the evidence showed that Hacienda Tile, Inc. "was a sham that Xavier used to shield" the community asset of Hacienda Homes;

(4) the trial court erred in awarding a disproportionate division of property to Xavier; and

(5) the trial court erred by allowing Xavier, over Stephanie's objection, to testify about corporate and financial documents that had not been provided in response to discovery requests, in violation of Texas Rules of Civil Procedure 190.3(b)(1)(A) and 193.6.

However, because we are remanding the entire community estate to the trial court for a just and right division, we need not reach these other issues.

### POSSESSION ORDER

Next, Stephanie Garza complains that the trial court abused its discretion "by ordering periods of possession based on [Xavier Garza]'s request rather than ... [based on] what was in the best interest of the children." With regard to issues of custody, control, possession, child support, and visitation, we give the trial court wide latitude and will reverse the trial court's order only if it appears from the record as a whole that the trial court abused its discretion. *In re J.R.D.*, 169 S.W.3d 740, 743 (Tex.App.-Austin 2005, pet. denied); *see Gillespie v. Gillespie*, 644 S.W.2d 449, 451 (Tex.1982) (applying abuse of discretion standard to possession order). Because the trial court is faced with the parties and their witnesses and observes their demeanor, it is in a better position to evaluate what will be in the best interest of

the children. *In re J.R.D.*, 169 S.W.3d at 743; *see In re N.A.S*, 100 S.W.3d 670, 673 (Tex.App.-Dallas 2003, no pet.) ("[T]he trial judge is in the best situation to observe the demeanor and personalities of the witnesses and can feel the forces, powers, and influences that cannot be discerned by merely reading the record.") (quotation omitted).

Before the divorce, Stephanie was the primary care-taker of her two sons. Once Xavier filed for divorce, pursuant to temporary orders, the children spent equal time with both parents. The children spent Monday and Tuesday with Stephanie, and Wednesday and Thursday with Xavier. And, they would spend every other Friday, Saturday, and Sunday with each parent. Under the final possession order, the children spend Monday after school, all day Tuesday and Wednesday, and Thursday before school with Xavier. They spend Thursday after school and Friday before school with Stephanie. They alternate between parents Friday after school, Saturday, Sunday, and Monday before school. They spend half of July and August with Stephanie.

 Stephanie first complains that the trial court erred by entering a possession order which decreased her weekly possession of the children. According to Stephanie, it would be in the best interest of the children to spend an equal amount of time with each parent. She argues that because the children had done well under the temporary orders, there was no need to change possession periods.

At trial, Dr. John Reid, a psychologist, testified that he believed, along with the majority of psychologists and child care professionals, that it is not in the best interest of children to split time fifty/fifty with each parent. On the contrary, according to Dr. Reid, it is most beneficial for children to have one secure residence where they spend most of their time and think of as their home, and then have another house to visit on the weekends.

There was evidence at trial that Stephanie is a good, loving, and caring mother. Witnesses testified that she is nurturing, patient with children, and has a good relationship with her sons. Yet, there was also evidence that although both Stephanie and Xavier had some difficulty in psychological functioning, Stephanie's problems were more significant. Evidence showed that Stephanie exhibited difficulty thinking logically and coherently; the evidence also showed that her problems involved rage episodes, mood fluctuations, and impulsive and unpredictable behavior. According to Dr. Reid, because he believed that Xavier had a better chance to provide a stable, consistent, and safe environment for the children, he recommended that the children's primary domicile be with Xavier.

 The best interest of the child is always the primary consideration in determining issues of conservatorship and possession. TEX. FAM.CODE. ANN. § 153.002 (Vernon 2002). While there is a statutory presumption that the parents be appointed joint managing conservators, there is no statutory presumption that joint managing conservators be awarded equal periods of possession. *Compare id.* § 153.131(b) (presumption that appointment of parents as joint managing conservators is in best interest of child), *with id.* § 153.135 (providing that joint managing conservatorship does not require the award of equal or nearly equal periods of physical possession of and access to the child). Thus, by entering a possession order that did not provide for equal possession periods, the trial court did not abuse its discretion.

 Secondly, Stephanie complains that the trial court's order deviates from the standard possession order because

"the two periods of fourteen-day summer visitation have to be separated by at least a period of fourteen consecutive days." According to Stephanie, such an arrangement is "not in the best interest of the children because it causes them to lose one or more weekends with their mother than they would have under the standard possession order."

Section 153.312(b) of the Family Code provides that upon written notice, the managing conservator shall have possession of the child for vacations and certain other holidays for a period of "thirty days ... to be exercised in not more than two separate periods of at least seven consecutive days each." *Id.* § 153.312. Here, the extended summer possession order provides that Stephanie shall have possession of the children "for thirty days ... to be exercised in two separate periods of at least fourteen consecutive days each. These periods of possession shall ... be separated by at least a period of fourteen consecutive days."

■ Regarding summer visitation, Dr. Reid acknowledged that generally, people prefer to have a block of time with their children so they can take vacations. However, for children as young as Xavier and Stephanie's children, he recommended that they not be removed from either parent for longer than two weeks without a weekend in between. The trial court followed Dr. Reid's recommendation, ordering that during summer vacations, Stephanie may spend two separate periods of at least fourteen consecutive days each so that the children will be able to reconnect with their father. When deviating from the standard possession order, a trial court may consider the age, development status, circumstances, needs, best interest of the child, and any other relevant factor. *Id.* § 153.256. Here, the trial court properly considered the young age of the children

and their need to stay in a close relationship with the parent with whom they primarily reside. Such an arrangement is also consistent with section 153.312. *See id.* § 153.312(b) (providing that the thirty days of summer visitation should be exercised in not more than two separate periods of at least seven consecutive days). Therefore, the trial court did not abuse its discretion.

■ Third, Stephanie argues that the trial court "erred by ignoring the historical involvement of each parent when allocating their respective rights and duties." Section 153.071 of the Texas Family Code provides that, when both parents are appointed as conservators of the child, the court shall specify the rights and duties of the parents that are to be exercised by each independently, by joint agreement of the parents, and exclusively by one parent. *Id.* § 153.071. Joint managing conservatorship is defined as the sharing of the rights and duties of a parent by two parties, even if the exclusive right to make certain decisions is awarded to one party. *Id.* § 101.016; *see Albrecht v. Albrecht,* 974 S.W.2d 262, 265 (Tex.App.-San Antonio 1998, no pet.) ("In joint managing conservatorship, one parent is usually given slightly greater powers than the other parent.").

Here, the divorce decree names both Xavier and Stephanie as joint managing conservators. The trial court ordered that among those rights and duties that Xavier shall exercise exclusively is the right (1) to establish the primary residence of the children; (2) to consent to medical, dental, and surgical treatments involving invasive procedures and to consent to psychiatric and psychological treatments of the children; (3) to represent the children in any legal action; (4) to make decisions concerning the children's education, after consultation with Stephanie; (5) to have the right to

possession of the children at all other times not specifically designated in the standard possession order for Stephanie; and (6) to receive payments of child support.

Stephanie emphasizes that evidence showed that she is "the parent with detailed knowledge of the children's medical conditions and treatment, educational status, and development progress" and that she has been the parent involved with the children's medical issues from the beginning. However, the trial court and the jury were also presented with evidence that Stephanie had difficulty thinking rationally and logically, controlling her mood swings and anger, and arriving at a logical solution when faced with a problem. Therefore, the trial court did not abuse its discretion by giving Xavier the exclusive rights listed above.

## ADMISSION OF THE EVIDENCE

### A. Admission of Medical and Mental Health Records

Next, Stephanie argues that the trial court erred in admitting her medical and mental health records because it violated her physician-patient and mental-health-information privileges. Further, she argues that admitting these records violated the rules of evidence relating to relevance, hearsay, and reliability. A trial court's decision to admit or exclude evidence is within its sound discretion. *Nat'l Liab. & Fire Ins. Co. v. Allen,* 15 S.W.3d 525, 527 (Tex.2000). On appeal, we review a trial court's evidentiary decisions for abuse of discretion. *Id.* at 527–28.

 First, Stephanie argues that admission of her medical and mental health records violated the physician-patient and mental-health-information privileges. Generally, the diagnosis of a patient by a physician and the communications between a patient and physician are privileged. *See* Tex.R. Evid. 509. Likewise, with regard to a person's mental health, the diagnosis of the patient and communications between the patient and a mental-health professional are privileged. *See* Tex.R. Evid. 510. However, these privileges are not absolute. *See* Tex.R. Evid. 509(e), 510(d). An exception to both privileges applies "to a communication or record relevant to an issue of the physical, mental or emotional condition of a patient in any proceeding in which any party relies upon the condition as a part of the party's claim or defense." Tex.R. Evid. 509(e)(4), 510(d)(5); *see R.K. v. Ramirez,* 887 S.W.2d 836, 843 (Tex.1994) (explaining that to be part of a party's claim or defense, the patient's condition "itself must be of legal consequence to a party's clam or defense").[1]

---

1. Former Rule 509 and former Rule 510 explicitly provided for an exception to privilege when "the disclosure is relevant in any suit affecting the parent-child relationship." In 1998, both rules were amended to omit reference to SAPCR proceedings. However, both rules' comments emphasize that "[f]ormer subparagraph (d)(6) of the Civil Evidence Rules, regarding disclosures in a suit affecting the parent-child relationship, is omitted, not because there should be no exception to the privilege in suits affecting the parent-child relationship, but because the exception in such suits is properly considered under subparagraph (e)(4) of the new rule (formerly subparagraph (d)(4)), as construed in *R.K. v. Ramirez,* 887 S.W.2d 836 (Tex.1994)." Tex.R. Evid. 509 cmt; *see id.* 510 cmt. (same). The comments to both rules also state that "[i]n determining the proper application of an exception in such suits, the trial court must ensure that the precise need for the information is not outweighed by legitimate privacy interests protected by the privilege." Tex.R. Evid. 509 cmt., 510 cmt.

■ Here, the jury was asked to determine who should be appointed managing conservator of the children. Stephanie and Xavier both asked to be appointed sole managing conservator. Nevertheless, Stephanie argues that her medical records were not relevant because they did not contain information regarding Stephanie's parenting history or abilities. We disagree.

Stephanie's medical condition relating to her personality and bipolar disorders was relevant to the issue of whether appointing her sole managing conservator was in her children's best interests. Both parties' medical and mental conditions were relevant to the jury's determination of which party should be named as the conservator. Additionally, here, the trial court did not allow all Stephanie's medical and mental heath records in evidence, but instead took care to exclude references that predated the marriage. We can find no abuse of discretion on the part of the trial court.

■ Second, Stephanie argues that the records should have been excluded because the records were prejudicial, confusing, misleading, and because any probative value was substantially outweighed by the danger of unfair prejudice. *See* Tex.R. Evid. 403. However, because the best interest of the child must be the court's primary consideration in a suit affecting the parent-child relationship, rule 403 is an extraordinary remedy that must be used sparingly. *In re J.W.*, 113 S.W.3d 605, 612 (Tex.App.-Dallas 2003, pet. denied), *cert. denied sub nom. Griffin v. Tex. Dep't of Protective & Regulatory Servs.*, 543 U.S. 965, 125 S.Ct. 419, 160 L.Ed.2d 334 (2004); *In re C.Q.T.M.*, 25 S.W.3d 730, 736 (Tex. App.-Waco 2000, pet. denied). Here, the trial court concluded that the medical records pertaining to Stephanie's mental state were relevant to the issue of custody and that their probative value was not substantially outweighed by the danger of unfair prejudice. Reviewing the record, we find no abuse of discretion on the part of the trial court.

■ Third, Stephanie complains that the medical records were inadmissible hearsay. However, despite the multiple exhibits of medical records and multiple references to those records, she points to only one instance on page 88 of volume 5 of the Reporter's Record where she objected to the admission of the April 2, 1998 entry found in Exhibit 29 as inadmissible hearsay. Thus, with respect to the other admission of the other exhibits, Stephanie has failed to show that she preserved error. *See* Tex.R.App. P. 33.1, 38.1(h).

■ With respect to the April 2nd entry, Stephanie objected to "[t]he hearsay regarding drugs per Rodriguez." Reviewing the entire record, including the admission of the medical records in their entirety, we fail to see how one reference to prescription psychiatric drugs constitutes harmful error. *See* Tex.R.App. P. 44.1(a) (explaining that a judgment is not reversible unless the error complained of probably caused the rendition of an improper judgment or probably prevented the appellant from properly presenting the case to the court of appeals).

### B. Admission and Exclusion of Audiotapes

■ Stephanie complains that the trial court abused its discretion by admitting two audiotapes Xavier made of a conversation between him and Stephanie and by excluding a similar audiotape she made. According to Stephanie, Xavier's tapes should have been excluded under Texas Rule of Evidence 403. Stephanie, however, did not object to the admission of the tapes under rule 403 at trial and has failed to preserve error. *See* Tex.R.App. P. 33.1.

■ She also argues that Xavier's tapes should have been excluded because the conversations were "incomplete, out of context, and did not fairly and accurately represent what was being recorded." During their separation, Xavier recorded two conversations between himself and Stephanie without her knowledge. According to Xavier's testimony, he cut off the first audiotape when Stephanie left the room. With respect to the second audiotape, he had entered the home when, according to Xavier, Stephanie had become violent. So, he left the house, went to his pick-up truck, and got his recorder. He then re-entered the home and recorded the second conversation. At trial, Stephanie objected to the tape being "incomplete." The trial court overruled her objection and said her concerns were a "subject for cross-examination." We find no abuse of discretion by the trial court.

■ Moreover, even if the trial court did abuse its discretion, any error is harmless. Even though the beginning of one conversation had not been recorded (when Xavier went to his truck), the trial court considered each conversation to be distinct and complete. And, although the audiotape depicts a verbal argument between the parties, other evidence admitted showed that Stephanie had problems with anger, including mood and rage episodes which were accompanied with physical violence. Thus, the audiotapes were cumulative of other evidence, and any error was harmless. *See* Tex.R.App. P. 44.1(a); *In-*

terstate Northborough P'Ship v. State, 66 S.W.3d 213, 220 (Tex.2001).

■ Second, Stephanie argues that the trial court erred by excluding a similar audiotape offered by her to impeach Xavier. She offered the audiotape to impeach Xavier's statement regarding whether he had refused her telephone access to the children, whether he spoke in front of the children about Stephanie in a derogatory manner, and whether he had refused to allow her to babysit the children. Any error, however, was harmless. *See* Tex.R.App. P. 44.1(a). At trial, Stephanie testified about the events depicted on the audiotape, stating that during their separation, when Xavier needed someone to babysit the children, she had asked to take care of them but was refused. She also testified, contrary to Xavier's testimony, that Xavier had spoken about her in a derogatory manner in front of the children and would not allow them to speak with her while in his possession. Thus, any alleged error in exclusion of the audiotape offered by Stephanie is harmless error, because it was cumulative. *See* Tex.R.App. P. 44.1(a); *Interstate*, 66 S.W.3d at 220.

### C. *Unrecorded Bench Hearings*

■ Next, Stephanie argues that she is entitled to a new trial because the trial court abused its discretion by failing to ensure that all bench conferences were recorded by the court reporter.[2] According to Stephanie, she was harmed because

---

**2.** Rule 13.1 of the Texas Rules of Appellate Procedure provides that the court reporter must attend court sessions and make a full record of the proceedings, unless he is excused by agreement of the parties. Tex.R.App. P. 13.1. The Government Code imposes similar obligations on the court reporter. *See* Tex. Gov't Code Ann. § 52.046(a) (Vernon 1988). Furthermore, section 105.003(c) of the Texas Family Code provides that in a suit affecting parent-child relationship, "[a] record shall be made as in civil cases generally unless waived by the parties with the consent of the court." Tex. Fam.Code Ann. § 105.003(c) (Vernon 2002). This provision places an affirmative duty upon the trial court to ensure that the court reporter makes a record of proceedings involving parent-child relationships. *In re D.J.M.*, 114 S.W.3d 637, 639 (Tex.App.-Fort Worth 2003, pet. denied).

the bench conferences relating to the admission of the audiotapes and the mental health records offered by Xavier and the exclusion of the audiotape offered by her were not recorded. Thus, she argues that she is unable to bring these issues on appeal. *See* TEX.R.APP. P. 44.1(a)(2) (appellate court must reverse judgment if the error complained of probably prevented the appellant from properly presenting the case to the court of appeals). However, as we have discussed above, we have been able to determine the merits of these issues and have determined that the admission of Xavier's evidence and the exclusion of Stephanie's evidence did not constitute harmful error. Thus, Stephanie was not harmed by the failure of the court reporter to record the bench conferences.

### CONCLUSION

Because we have concluded that the trial court's mischaracterization of property affected the just and right division of the community estate, we remand the entire community estate for a just and right division based upon the correct characterization of the property. In other respects, we affirm the judgment of the trial court.