

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-19-00083-CV

_____


IN THE MATTER OF THE MARRIAGE OF
ALLISON MARIE COLLINSWORTH AND ANDREW KIMBLE COLLINSWORTH AND
IN THE INTEREST OF E.C. AND B.C., CHILDREN


On Appeal from the County Court at Law
Bowie County, Texas
Trial Court No. 18D0999-CCL


Before Morriss, C.J., Burgess and Stevens, JJ.
Opinion by Justice Stevens

# O P I N I O N

The trial court granted Allison Marie Collinsworth's petition for divorce from Andrew Kimble Collinsworth and awarded her sole managing conservatorship of their children, E.C. and B.C. On appeal, Andrew argues that the trial court erred in awarding Allison the marital home after finding it to be community property and in making an unequal disposition of the parties' community assets, i.e., their retirement accounts and tax refund.[1]

We find that the trial court properly awarded the marital home to Allison because it was her separate property. We also find that Andrew has failed to show that the trial court abused its discretion in dividing the community estate. As a result, we affirm the trial court's judgment.

## I.      Factual and Procedural Background

Allison and Andrew married in October 2011. They lived with their two children in a home purchased in 2008, before the marriage. Allison testified, and Andrew admitted, that Andrew had a history of alcoholism and drug use. According to Allison, before their marriage, Andrew, who was a nurse, "relapsed and went to rehab in 2009 or '10, and . . . did another two-year stint with the nursing board." The couple separated in July 2018 after Andrew was fired from his job as a nurse at the Texarkana Surgery Center for failing to take a drug test when complaints were raised about his drug use.

During the separation, Allison testified that she lived with Andrew's mother after Andrew locked her out of the marital home. Allison withdrew $6,815.00 from one joint bank account and

---

[1]Andrew does not complain of the trial court's appointment of Allison as sole managing conservator of the children, its visitation order, or its order to pay child support.

$2,500.00 from another, leaving Andrew with $700.00. According to Allison, she took the money to protect her family because "[t]he money was being used for gambling and for drugs."[2]

Allison said that Andrew would come to his mother's house "manic," would call and come by "all hours of the night," and "would just be sitting outside on the porch, waiting." At one point, law enforcement became involved when Andrew came into the house and knocked over his mother in earshot of his son. As a result of his harassing behavior, Andrew was banned from his mother's house and was ordered by an Arkansas court to have no contact with Allison or the children.

Even though he was served with that order, Andrew violated it by going to B.C.'s school and was arrested. Allison testified that she walked by Andrew's car as he was being arrested and saw empty bottles of alcohol, spoons with a black substance on them, and a tourniquet. Allison offered and the trial court admitted photos of the items in the car into evidence. The trial court also admitted photos of the marital home showing that, even though he was an alcoholic and drug user, Andrew left beer in the refrigerator and placed empty beer and liquor bottles, a used needle, a tourniquet, and needle caps throughout the house. Andrew testified that he was on legally prescribed hydrocodone during that time and admitted that he sold items taken from the family home.

In August, Allison petitioned for divorce and sought a disproportionate share of community assets as a result of Andrew's fault in the breakup of the marriage, his wasting of community assets, her anticipation that she would be the sole managing conservator of the children, and the

_____

[2]The court also heard evidence that Andrew squandered money on gambling and drugs after the date of separation. Based on that evidence, and Allison's testimony that she withdrew the money on the date of separation, the trial court could infer that Andrew also squandered community funds on gambling and drugs prior to the separation.

children's needs. Shortly thereafter, the trial court ordered Andrew to vacate the marital home so that Allison could live there with their children. Allison testified that Andrew failed to comply with the order to vacate for weeks, but finally gave in.

In violation of other court orders, Andrew kept breaking into the marital home. Allision testified that Andrew bent the window screens, ruined door jambs, cracked a window, damaged sheetrock and molding, and tried to come in through the attic, causing insulation to hang from the ceiling. Allision also said that Andrew "had an absolute raging fit and destroyed [the bedroom] and broke everything." She testified, "All the drawers were broken. There were pictures, there were bottles. He just lost it, I guess." The trial court admitted photos of the damage to the home caused by Andrew's attempts to break in. After she installed cameras that caught Andrew in the act, he was arrested.

Andrew said that he was addicted to methamphetamine around that time and that "it was ugly for about three months." He cashed out around $15,000.00 of his retirement account to live on and admitted to gambling. Andrew did not take the court-ordered nail drug test, claiming that he tried to do so five times but that his nails were too short each time.[3] He admitted that he was arrested three times during the pendency of the case for criminal trespass as a result of his breaking into the home in violation of a court order, for possession of methamphetamine, and for possession of drug paraphernalia. Allison testified that Andrew was also arrested for driving while intoxicated

---

[3]The trial court's order required Andrew to submit a nail sample for drug testing. Although Andrew testified that three separate urinalyses were negative for drugs, Allison testified that Andrew knew how to "fake" a urinalysis.

4

and public intoxication during that time and had, in the past, driven drunk with the children in the car. [4]

In December 2018, Andrew was involved in an accident and was not cleared for work until two weeks before the April 2019 trial. As a result, while he had made $23.00–$27.00 dollars an hour before he lost his job, he said he was unable to support himself or make any child support payments. Meanwhile, Allison was the sole provider. Since the separation, she used the money withdrawn from the joint accounts and her salary as a Best Buy employee to make Andrew's car payment for two months and to pay the $1,176.48 monthly mortgage on the home, all the bills, health insurance for Andrew and her children, child care at $250.00 per month for B.C., and E.C.'s $600.00 monthly private school fees.

Allison testified that she sought a disproportionate share of community assets because Andrew subjected her to cruel treatment and wasted community property. Andrew agreed that the marital home should be awarded to Allison because he "want[ed] the boys to have the home with her." Even so, he requested half of the equity that was built up in the asset.[5] Andrew testified that the home was purchased by both Allison and him, that he made no down payment, and that the down payment for the home came from money paid by Allison's mother and her friend. Although Andrew claimed that the money for the down payment was given to them both, he admitted he had no idea if his name was included on the checks given to Allison for the down payment.

---

[4]All of Andrew's criminal charges were still pending at the time of trial.

[5]The trial court noted that the home was purchased for $122,500.00, that the balance was $91,000.00, and that, after subtracting the down payment and other payments made solely by Allison, there was little equity in the home.

Allison introduced evidence showing that the home was purchased in 2008, well before the marriage. While evidence showed that both Allison and Andrew were liable on the mortgage as borrowers, the deed to the property was not introduced, and Allison testified that she made the down payment for the home from funds gifted solely to her before the marriage. The checks from Allison's mother and her friend introduced into evidence showed that Andrew was not included as a payee on the checks, which had memo lines stating that the money was for a down payment. Allison's mother, Cathy Missildine, and her friend, Jean Hoffman, both testified that the money for the down payment of the home was gifted solely to Allison. Hoffman even said that she had only recently met Andrew and had no reason to gift him anything.

Although Andrew had cashed out $15,000.00 from his retirement account and Allison said she received no benefit from those funds, Andrew wanted one-half of Allison's $30,000.00 retirement account. He also wanted one-half of their anticipated $8,000.00 tax return and his four guns, gun cabinet, knives, tools, guitar studs, guitars, and clothing. Allison testified that she had a $20,000.00 IRA and that Andrew also had another retirement account containing an unknown amount of money from a prior job at Christus St. Michael. She asked the trial court for reimbursement of the $100.00 per month payment she made for Andrew's health insurance after the separation, reimbursement of $150.00 per month for the children's health insurance, and child support. She also testified that each party should keep their own retirement accounts.

On the record, the trial court found that the down payment for the marital home "was a gift to [Allison] and her alone." For that reason, it awarded Allison the marital home. The trial court ordered that Andrew's $4,000.00 from the anticipated tax refund was to be used to pay his child

support arrearage from the date of separation and that any remaining sums would be held in a trust account for future child support payments. The trial court ruled that Andrew would receive $10,000.00 of Allison's total retirement and that Allison would receive one-half of Andrew's retirement from Christus St. Michael once the parties discovered how much that account contained. After stating that Andrew had acted in contempt of court orders, the trial court said it would award Allison a disproportionate share of community assets because of the extent of the damage he caused to the house and "her basically supporting the family those months with zero help and her maintaining health insurance on his behalf for that period of time."

After this oral ruling, the parties entered into a Rule 11 Agreement showing that the balance of Andrew's Christus St. Michael retirement was $20,000.00, making Allison's awarded one-half a little over $10,000.00. The agreement, which was signed by everyone, stated, "Whereas the parties acknowledge that the cost of dividing the accounts would outweigh the difference. The parties therefore agree that Petitioner shall keep all of her retirement accounts and Respondent shall keep his Christus [St. Michael] Plan. This shall be reflected in the Final Decree submitted to the Court."

In its final decree of divorce, the trial court found that Allison was "entitled to a di[s]proportionate share of the community estate based on [Andrew's] fault in the breakup of the marriage, the conservatorship of the children and waste of community assets by [Andrew]." In line with the Rule 11 Agreement, it awarded each party their own retirement accounts. The order awarded Allison sole managing conservatorship of the children, with limited supervised visitation rights to Andrew, and memorialized the rulings made in open court on the child support payments

7

and disposition of the tax return. It also awarded each party with the furniture, appliances, equipment, goods, clothing, and funds in their possession or subject to their sole control. Since Andrew's vehicle had been repossessed after the separation even though Allison made two payments on his car after the separation and he had withdrawn his retirement account, the trial court awarded Allison the motor vehicle used by her. Andrew was awarded the guns, knives, guitars, and the clothing he still had in the marital home.

On appeal, Andrew complains of the disproportionate disposition of community assets.

## II.     The House Was Allison's Separate Property

Even though he testified that Allison should be awarded the marital home at trial, in his first point of error on appeal, Andrew argues that the trial court erred in awarding it to her along with the equity in the home. He claims that he had a one-half interest in the home as his separate property. Because we conclude that the home was Allison's separate property, we disagree.

First, we find that Andrew cannot now complain that the trial court erred in awarding Allison the home when he asked the trial court to do so. "When a party requests a trial court to take an action, the doctrine of invited error prohibits that party from complaining of the error on appeal." *Basley v. Adoni Holdings, LLC*, 373 S.W.3d 577, 588 n.17 (Tex. App.—Texarkana 2012, no pet.) (citing *In re Dep't of Family & Protective Servs.*, 273 S.W.3d 637, 646 (Tex. 2009)). As a result, we only address whether he was entitled to any equity in the home. To answer this question, we examine the characterization of the property and the state of the evidence presented at trial.

8

"Property possessed by either spouse during or on dissolution of marriage is presumed to be community property." TEX. FAM. CODE ANN. § 3.003(a). To rebut this presumption, the person seeking to prove the separate character of the property must do so by clear and convincing evidence. TEX. FAM. CODE ANN. § 3.003(b). Separate property is the property owned before marriage as well as property acquired during marriage through gift, devise, and descent. TEX. FAM. CODE ANN. § 3.001. All other property that is not separate property is community property. TEX. FAM. CODE ANN. § 3.002. "'Clear and convincing evidence' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007. "Any doubt as to the character of property should be resolved in favor of the community estate." *In re Marriage of Moncey*, 404 S.W.3d 701, 706 (Tex. App.—Texarkana 2013, no pet.) (citing *Garza v. Garza*, 217 S.W.3d 538, 548 (Tex. App.—San Antonio 2006, no pet.)).

"We determine whether property is separate or community by its character at the time of inception." *Marriage of Taylor*, No. 06-14-00061-CV, 2015 WL 428121, at *3 (Tex. App.—Texarkana Feb. 3, 2015, no pet.) (mem. op.) (citing *Barnett v. Barnett*, 67 S.W.3d 107, 111 (Tex. 2001)). "Inception of title occurs when a party first has a right of claim to the property by virtue of which title is finally vested." *Id.* (quoting *Zagorski v. Zagorski*, 116 S.W.3d 309, 316 (Tex. App.—Houston [1st Dist.] 2003, pet. denied)). "Further, to overcome the community property presumption, the spouse claiming property is separate 'must clearly trace the original separate property into the particular assets on hand during the marriage.'" *Id.* (quoting *Cockerham v. Cockerham*, 527 S.W.2d 162, 167 (Tex. 1975)). "Tracing involves establishing the separate origin

9

of the property through evidence showing the time and means by which the spouse originally obtained possession of the property." *Id.* (quoting *Zagorski*, 116 S.W.3d at 316; *In re Marriage of Parker*, 997 S.W.2d 833, 837 (Tex. App.—Texarkana 1999, pet. denied)). "Even though the separate property may go through a series of exchanges, it will retain its separate character if the party can trace the assets on hand during the marriage to property that was separate when first acquired." *Id.* (citing *Celso v. Celso*, 864 S.W.2d 652, 654 (Tex. App.—Tyler 1993, no writ) (citing *Cockerham*, 527 S.W.2d at 167)).

Allison proved that the home was purchased several years before the marriage. There was ample testimony at trial, and the trial court found, that the down payment for the home came from checks made out solely to Allison as gifts to her. The trial court properly concluded that Allison sufficiently traced the funds used to acquire the home to her separate property. *See In re Marriage of Kluth*, No. 06-07-00129-CV, 2008 WL 2150961, at *2 (Tex. App.—Texarkana May 23, 2008, no pet.) (mem. op.); *Whorrall v. Whorrall*, 691 S.W.2d 32, 35 (Tex. App.—Austin 1985, writ dism'd). As a result, Allison established her separate property ownership to the property and rebutted the community presumption by clear and convincing evidence.

Andrew also believes he established his one-half ownership to the home as separate property. While Andrew's name was included on the mortgage and settlement statement as a "borrower," there was no deed introduced into evidence showing that the property was in his name. Also, Andrew made no claim for reimbursement. The trial court found that Andrew contributed no funds to the acquisition of the separate property home. Because there was no evidence of Andrew's actual ownership of the home, as opposed to his debt, the trial court did not err in finding

10

that Andrew was not entitled to one-half of the equity in the home. We overrule Andrew's first point of error.[6]

## III. The Trial Court's Division of Community Property Was Not an Abuse of Discretion

In his second point of error, Andrew complains of the trial court's division of community property, particularly the parties' retirement accounts and anticipated tax refund. He complains that the trial court did not consider relevant factors in making the property division. We find that Andrew has failed to show that the trial court abused its discretion in its division of the community estate.

### A. Standard of Review

"The division of community property need not be equal." *Matter of Marriage of Lewis*, No. 06-19-00046-CV, 2020 WL 34919, at *3 (Tex. App.—Texarkana Jan. 3, 2020, no pet. h.) (mem. op.) (citing *Matter of Marriage of Mozley*, No. 06-16-00004-CV, 2016 WL 4256926, at *3 (Tex. App.—Texarkana Aug. 12, 2016, no pet.) (mem. op.)). "However, it 'must be "just and right, having due regard for the rights of each party."'" *Id.* (quoting *Bradshaw v. Bradshaw*, 555

---

[6]Because the trial court's judgment awarding Allison the marital home and divesting Andrew of any right, title, and interest in the home came underneath a section labeled "*Division of Marital Estate*," Andrew argued that it was "obvious" that the trial court found the home to be community property. As a result of the trial court's finding that Allison had traced the funds used to purchase the property back to her separate property, we disagree. Nevertheless, as we have stated previously,

> [E]ven if the trial court mischaracterizes property in its division of the marital estate, the error does not require reversal "unless the mischaracterization would have had more than a de minimis effect on the . . . court's just and right division of the property." Reversible error exists as a matter of law only if the trial court characterizes property as community property and awards it to one spouse when it is established as the separate property of the other spouse.

*Moncey*, 404 S.W.3d at 706 (citations omitted).

S.W.3d 539, 543 (Tex. 2018) (quoting TEX. FAM. CODE ANN. § 7.001)).  In determining what is a

just and right division,

> "courts may consider many other factors, such as

> 'the spouses' capacities and abilities, benefits which the party not at fault would
> have derived from continuation of the marriage, business opportunities, education,
> relative physical conditions, relative financial condition and obligations, disparity
> of ages, size of separate estates, and the nature of the property."

*Id.* at *3–4 (quoting *Matter of Marriage of Williams*, No. 06-18-00041-CV, 2018 WL 6424245, at

*5 (Tex. App.—Texarkana Dec. 7, 2018, pet. denied) (mem. op.) (quoting *Murff v. Murff*, 615

S.W.2d 696, 699 (Tex. 1981)).  "The court may consider the 'fault in breaking up the marriage[,']

though the community-property division 'should not be a punishment for the spouse at fault.'"  *Id.*

at *4 (quoting *Bradshaw*, 555 S.W.3d at 543 (quoting *Young v. Young*, 609 S.W.2d 758, 761–62

(Tex. 1980)).

"Because the standards for dividing a community estate involve the exercise of sound

judgment, a trial court must be accorded much discretion in its decision."  *Id.* (quoting *Bradshaw*,

555 S.W.3d at 543).  "The division 'should be corrected on appeal only where an abuse of

discretion is shown in that the disposition made of some property is manifestly unjust and unfair.'"

*Id.* (quoting *Bradshaw*, 555 S.W.3d at 543 (quoting *Hedtke v. Hedtke*, 248 S.W. 21, 23 (Tex.

1923)).  "The appellate court cannot merely reweigh the evidence."  *Id.* (quoting *Bradshaw*, 555

S.W.3d at 543).  "Accordingly, we will reverse the trial court's judgment only where it 'clearly

abused its discretion and if the error materially affects the court's just and right division of the

property.'"  *Id.* (quoting *Williams*, 2018 WL 6424245, at *4 (quoting *Bigelow v. Stephens*, 286

S.W.3d 619, 620 (Tex. App.—Beaumont 2009, no pet.)).  "Under an abuse of discretion standard,

12

legal and factual sufficiency are relevant factors in assessing whether the trial court abused its discretion, but they are not independent grounds of error." *Id.* (quoting *Williams*, 2018 WL 6424245, at \*4 n.7 (citations omitted)). "If there is any reasonable basis for doing so, we must presume that the trial court properly exercised its discretion." *Id.* (quoting *Williams*, 2018 WL 6424245, at \*4).

"The party complaining of the trial court's property division must demonstrate from evidence in the record that the division was so unjust that the trial court abused its discretion." *Id.* (quoting *Williams*, 2018 WL 6424245, at \*4). "In determining whether an abuse of discretion has occurred, we view the evidence in a light most favorable to the court's decision and indulge every legal presumption in favor of its judgment." *Id.* (quoting *In re Marriage of Ford*, 435 S.W.3d 347, 350 (Tex. App.—Texarkana 2014, no pet.)).

### B. Analysis

We will not utilize a piecemeal approach to the trial court's property division. *See id.* (citing *Jacobs v. Jacobs*, 687 S.W.2d 731, 732 (Tex. 1985); *McDonald v. McDonald*, No. 01-00-01160-CV, 2001 WL 778873, at \*2 (Tex. App.—Houston [1st Dist.] July 12, 2001, no pet.)). Instead, "we will look to the entire property division to determine whether [Andrew] can meet h[is] burden to show that the trial court abused its discretion in finding the division just and right." *Lewis*, 2020 WL 34919, at \*3.

Here, the trial court properly considered Andrew's drug use and fault in the breakup of the marriage in awarding Allison a disproportionate share of community assets. The trial court heard that Andrew had cashed out $15,000.00 from his retirement account and had squandered

community assets on alcohol, drugs, and gambling both before and during the separation. He became addicted to methamphetamine, failed to contribute in any way to the support of his children, and committed acts in violation of Texas and Arkansas court orders, including the vandalism of the family home.

Also, the trial court heard evidence that Andrew was a nurse who made around $23.00–$27.00 per hour when he was working and that Allison worked at Best Buy. Given Andrew's education as a nurse, capabilities and abilities, business opportunities, and earning potential when healthy and sober, the trial court concluded that a disproportionate disposition was necessary. Its decision considered their backgrounds, Andrew's pending criminal charges, and the fact that Allison was awarded sole managing conservator of the children and would have to pay for their needs. The trial court also considered the cost of repairing the damage Andrew caused when he vandalized the family home and Allison's continued payment of the cost of his health insurance throughout the separation.

For these reasons, Andrew's withdrawal of $15,000.00 from his retirement account, and the Rule 11 Agreement which memorialized the parties' agreement "that Petitioner shall keep *all* of her retirement accounts," the trial court awarded each party their own retirement accounts. (Emphasis added). While the trial court split the parties' tax refund equally, Andrew's portion was to be used to pay past and future child support obligations since Andrew testified that he could not even support himself, making it unlikely that he would be able to make future child support payments. With no value placed on the firearms, guitars, and other items awarded to Andrew in comparison to the household items not damaged or sold by Andrew during the separation that were

14

awarded to Allison, we cannot say that the trial court's division of community assets was so grossly disproportionate as to remove it from the realm of a just and right division.

We find that Andrew has failed to show that the trial court's disposition of community assets was an abuse of discretion or was manifestly unjust and unfair. For that reason, we overrule Andrew's last point of error.

## IV. Conclusion

We affirm the trial court's judgment.

Scott E. Stevens
Justice

Date Submitted:     January 31, 2020
Date Decided:       February 5, 2020

15