# NO. 12-06-00405-CV

# IN THE COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT

# TYLER, TEXAS

| | | |
|---|---|---|
| *YAKOV ELMAKISS,*<br>*APPELLANT* | § | *APPEAL FROM THE* |
| *V.* | § | *COUNTY COURT AT LAW NO. 2 OF* |
| *RUTH MARIE ELMAKISS,*<br>*APPELLEE* | § | *SMITH COUNTY, TEXAS* |

### *MEMORANDUM OPINION*

Yakov Elmakiss appeals a final decree of divorce. In four issues, he argues that the trial court abused its discretion by (1) making a manifestly unjust and unfair property division, (2) awarding Ruth Marie Elmakiss equitable reimbursement for payment of community debts with her separate funds, (3) failing to appoint Yakov joint managing conservator of their child, (4) failing to order possession according to the standard possession order, and (5) failing to correctly calculate Yakov's child support obligation. We reverse and remand in part and affirm in part.

### BACKGROUND

Yakov and Ruth are the parents of a child, R.E.E., born April 28, 1998. In her second amended petition for divorce, Ruth requested that she be appointed sole managing conservator and that Yakov be obligated to make child support payments. She also requested reimbursement for funds or assets expended by her separate estate for payment of unsecured liabilities of the community estate. Further, Ruth requested a disproportionate share of the parties' estate. In his counterpetition for divorce, Yakov requested that he and Ruth be appointed joint managing conservators. The trial court ordered that the parties exchange sworn inventories. Ruth filed a proposed parenting plan, an inventory and appraisement, and a proposed property division. Yakov failed to file any of these documents.

After a bench trial on April 4, 2006, the trial court approved Ruth's parenting plan as being in the best interest of the child and stated that it believed appointing Ruth sole managing conservator was "mandatory." Further, the trial court agreed that, according to the parenting plan, Yakov's visitation and telephone contact with R.E.E. should be limited. The trial court also granted Ruth's reimbursement claim and approved Ruth's proposed property division. Before the trial court signed the decree of divorce, Ruth applied for, and was granted, an emergency ex parte order to suspend Yakov's possession of and access to R.E.E.

In the final decree of divorce, the trial court appointed Ruth as sole managing conservator and Yakov as possessory conservator of R.E.E. Further, the trial court found that "credible evidence" had been presented of a potential risk of international abduction of R.E.E. by Yakov because he lacked financial reasons to stay in the United States, was unemployed, and had strong familial, emotional, or cultural ties to Israel. Thus, the trial court found that unsupervised visitation was not in the best interest of the child, and ordered that Yakov's sole access to R.E.E. be through Kids Konnection and that telephone access be denied until further order of the trial court.

Further, the trial court ordered that Yakov pay child support in the amount of $266.68 per month. The trial court also ordered that the marital residence be sold and that the sum of $5,000.00 be paid to Yakov from the net sales proceeds with the remaining proceeds to be paid to Ruth. According to the trial court, Ruth received a greater portion of the proceeds of the marital residence to compensate her for her reimbursement claim in the amount of $6,983.26. Finally, the trial court divided the community property and awarded Ruth judgment against Yakov for her attorney's fees, expenses, accounting fees, expert witness fees, and costs in the amount of $26,664.77. This appeal followed.

## REIMBURSEMENT

In his second issue, Yakov argues that the trial court abused its discretion in awarding Ruth equitable reimbursement for payment of community debts with her separate funds. Ruth argues that Yakov failed to preserve error regarding this complaint when he failed to object to the tracing summary admitted into evidence, the proposed property division, or the proposed award for reimbursement. Even if Yakov preserved error, Ruth argues, he failed to offer any evidence to the

contrary.

**Applicable Law**

A claim for reimbursement includes (1) payment by one marital estate of the unsecured liabilities of another marital estate; and (2) inadequate compensation for the time, toil, talent, and effort of a spouse by a business entity under the control and direction of that spouse. TEX. FAM. CODE ANN. § 3.408(b) (Vernon 2006). The rule of reimbursement is purely an equitable one. *Vallone v. Vallone*, 644 S.W.2d 455, 458 (Tex. 1982). It obtains when the community estate in some way improves the separate estate of one of the spouses (or vice versa). *Id.* A right of reimbursement arises when the funds or assets of one estate are used to benefit and enhance another estate without itself receiving some benefit. *Id.* at 459. The party claiming the right of reimbursement has the burden of pleading and proving that the expenditures and improvements were made and that they are reimbursable. *Id.*; *Hailey v. Haiely*, 176 S.W.3d 374, 384 (Tex. App.–Houston [1st Dist.] 2004, no pet.). A trial court may not recognize a marital estate's claim for reimbursement for the payment of child support, alimony, or spousal maintenance, the living expenses of a spouse or child of a spouse, contributions of property of a nominal value, the payment of a liability of a nominal amount, or a student loan owed by a spouse. TEX. FAM. CODE ANN. § 3.409 (Vernon 2006). Reimbursement is not available as a matter of law, but lies within the discretion of the court. *Vallone*, 644 S.W.2d at 459.

**Analysis**

Michael Thomas, a certified public accountant accredited in business valuations, testified that Ruth's residence in Arizona was her separate property. According to his review of records provided by Ruth, that residence was sold. Thomas traced the proceeds of the sale of Ruth's separate property that went to pay the parties' community debts. According to Thomas, he traced the proceeds from the settlement statement for the sale of Ruth's Arizona residence to a bank account, and used a "community out first" tracing method to determine what community debts were paid from those proceeds. He determined that $6,983.26 from Ruth's separate property funds was used to pay community debts. Ruth offered a copy of Thomas's tracing summary as evidence. The tracing summary shows a deposit into the bank account of $20,619.52 identified as proceeds from the sale of Ruth's Arizona residence in October 2000. Twelve community debts, including credit card

3

accounts, were paid with a portion of those proceeds.  The amounts ranged from $9.95 paid to First USA Bank to $2,077.30 paid to Discover Card for a total of $6,983.26.  Although the exhibit included bank statements and copies of checks, it included no information about the nature of the amounts paid with the credit cards.  At the conclusion of the evidence, the trial court granted Ruth's reimbursement claim and, in the divorce decree, stated that it awarded Ruth a greater portion of the proceeds of the marital residence to compensate her for that claim.

Yakov contends there was no evidence that the debts were community debts, or that the debts were not incurred for living expenses of the parties or their child, and that eight of the eleven community debts were "nominal."  At trial, Yakov did not object to Thomas's testimony, the tracing summary, or the proposed property division.  Consequently, Ruth contends that Yakov has failed to preserve error regarding this complaint.  A complaint regarding the legal or factual sufficiency of the evidence may be made for the first time on appeal in the complaining party's brief.  TEX. R. APP. P. 33.1(a)(d); *Pace v. Pace*, 160 S.W.3d 706, 712 (Tex. App.–Dallas 2005, pet. denied).  Thus, Yakov did not waive his complaint by failing to complain at trial that the evidence was insufficient to support Ruth's reimbursement claim.

In family law cases, the abuse of discretion standard of review overlaps with the traditional sufficiency standards of review and, as a result, legal and factual sufficiency are not independent grounds of reversible error.  *Garza v. Garza*, 217 S.W.3d 538, 549 (Tex. App.–San Antonio 2006, no pet.); *Moroch v. Collins*, 174 S.W.3d 849, 857 (Tex. App.–Dallas 2005, pet. denied).  Instead, they constitute factors relevant to our assessment of whether the trial court abused its discretion. *Garza*, 217 S.W.3d at 549; *Moroch*, 174 S.W.3d at 857.  Thus, in considering whether the trial court abused its discretion because the evidence is legally or factually insufficient, we conduct a two pronged inquiry: (1) did the trial court have sufficient evidence upon which to exercise its discretion, and (2) did the trial court err in its application of that discretion?  *Garza*, 217 S.W.3d at 549; *Moroch*, 174 S.W.3d at 857.  We then consider whether, based on the evidence, the trial court made a reasonable decision. *Garza*, 217 S.W.3d at 549; *Moroch*, 174 S.W.3d at 857.

Ruth, as the party claiming the right of reimbursement, had the burden to prove that these expenditures were reimbursable.  *See Vallone*, 644 S.W.2d at 459. Thomas testified, without objection, that funds from Ruth's separate estate were used to pay community debts and that he used

4

the "community out first" tracing method to determine the amount of Ruth's separate funds used to pay those debts. However, neither Thomas nor Ruth testified or presented any documentation that the expenditures were reimbursable and more particularly that they were not for, among others, the living expenses of either spouse or the child. *See* TEX. FAM. CODE ANN. §§ 3.408(b), 3.409; *Vallone*, 644 S.W.2d at 459. Because Ruth did not show that these expenditures were reimbursable, she failed to meet her burden of proof regarding her claim for reimbursement. *See Vallone*, 644 S.W.2d at 459; *Hailey*, 176 S.W.3d at 384. Therefore, the trial court abused its discretion in awarding Ruth a claim for reimbursement. Accordingly, Yakov's second issue is sustained.

## PROPERTY DIVISION

In his first issue, Yakov argues that the trial court abused its discretion by making a manifestly unjust and unfair property division. More specifically, he contends that Ruth was awarded community property with a net value in excess of $100,000.00 while he was awarded property with a negative net value. Ruth contends that Yakov waived any complaint regarding the property values because he never filed a sworn inventory and appraisement.

### Standard of Review

We review a trial court's division of property under an abuse of discretion standard. *Moroch*, 174 S.W.3d at 857; *see also Garza*, 217 S.W.3d at 548. A trial court does not abuse its discretion if there is some evidence of a substantive and probative character to support the decision. *Garza*, 217 S.W.3d at 549; *Moroch*, 174 S.W.3d at 857. Further, we review a trial court's findings for legal and factual sufficiency. *Garza*, 217 S.W.3d at 549; *Moroch*, 174 S.W.3d at 857.

### Applicable Law

A trial court is charged with dividing the estate of the parties in a "just and right" manner, considering the rights of both parties. TEX. FAM. CODE ANN. § 7.001 (Vernon 2006); *Jacobs v. Jacobs*, 687 S.W.2d 731, 733 (Tex. 1985); *Moroch*, 174 S.W.3d at 855. It is the duty of the appellate court to presume that the trial court properly exercised its discretion in dividing the marital estate. *Hailey*, 176 S.W.3d at 380. The community property of the marital estate need not be equally divided. *Murff v. Murff*, 615 S.W.2d 696, 699 (Tex. 1981). A trial court may order an unequal division of the community property when a reasonable basis exists for granting that relief.

5

*Hailey*, 176 S.W.3d at 380. However, the division of property must not be so disproportionate as to be inequitable, and the circumstances must justify awarding more than one-half to one party. *Id.*

In exercising its discretion in dividing the marital estate, the trial court may consider many factors, including the disparity of incomes or of earning capacity of the parties, the parties' capacities and abilities, benefits that the party not at fault would have derived from continuation of the marriage, business opportunities, education, relative physical conditions, relative financial conditions and obligations, disparity of ages, the size of the parties' separate estates, and the nature of the property. *Murff*, 615 S.W.2d at 698-99.

## Analysis

Yakov argues that the divorce decree awarded him community property valued at $66,255.00, including $10,700.00 for a tractor that had been sold over a year before the divorce decree. Additionally, the award included an income tax benefit from the net operating loss totaling $58,781.00. Yakov contends this award was nothing more than a contingent asset, useful only to reduce his income when calculating future income taxes. Thus, Yakov argues that the true value of community property awarded to him was a negative $3,226.00. Further, Ruth was awarded a judgment against Yakov for attorney's fees and expert fees in the amount of $26,664.77. According to Yakov, Ruth was awarded community property assets valued at $101,676.00, in addition to the equity she received from the sale of the marital residence.

Ruth presented evidence relating to the division of property and debts, and filed an inventory and appraisement of the community assets. In the divorce decree, Yakov was awarded assets valued at $81,872.01, along with a travel trailer, a brokerage account, and any retirement accounts held in his name, the values of which were not specified. The evidence also indicates that he received the proceeds from the tractor sold prior to the divorce. Ruth was awarded assets valued at $92,723.00, along with four insurance polices and/or annuities, the values of which were not specified. Yakov was ordered to pay debts in the amount of $44,086.77, together with the amounts owed on three credit cards, the total of which was not specified. These debts included $8,021.50 for accounting, counselor, and psychologist fees and $18,643.27 for Ruth's attorney's fees because the trial court found that Yakov "made this a very expensive case when it didn't have to be." Ruth was ordered to pay debts in the amount of $23,207.00. Although she was awarded a vehicle valued at $8,345.00,

6

she owed approximately $7,701.00 on that vehicle.

We must presume that the trial court properly exercised its discretion in dividing the marital estate and, thus, Yakov has the burden on appeal to overcome this presumption. *See **Hailey***, 176 S.W.3d at 380. He presented no evidence at trial to dispute Ruth's valuations or proposed division of property, nor did he object to any of her valuations or the proposed property division. Because Yakov has not called our attention to any evidence in the record to rebut the presumption, we must presume that the trial court properly divided the marital estate. Further, although the division of assets and debts was not precisely equal in monetary amounts, the division of property was not so disproportionate as to be inequitable. *See **id***. Because Yakov failed to overcome the presumption that the trial court properly divided the marital estate, we conclude that the trial court did not abuse its discretion in its division of the community assets and debts. *See **Moroch***, 174 S.W.3d at 857. Accordingly, the portion of Yakov's first issue that relates to the property division is overruled.

We must also consider the trial court's division of the net sales proceeds of the marital residence. Ruth was ordered to sell the marital residence, which was to be listed at $90,000.00. The net sales proceeds were to be paid to Ruth, less $5,000.00 that was to be paid to Yakov. The trial court awarded Ruth a greater portion of the net proceeds of the marital residence as compensation for her $6,983.26 reimbursement claim. Because we have determined that the trial court abused its discretion in awarding Ruth her reimbursement claim, we conclude that the trial court did not have a reasonable basis to order an unequal division of the net proceeds from the sale of the marital residence. *See **Hailey***, 176 S.W.3d at 380. Consequently, the portion of Yakov's first issue that relates to the division of the net sales proceeds of the marital residence is sustained.

### CONSERVATORSHIP

As part of his third issue, Yakov contends that the trial court abused its discretion by failing to appoint him joint managing conservator of R.E.E. He argues that there is insufficient evidence to rebut the presumption that joint managing conservatorship is in R.E.E.'s best interest. Ruth argues that the record shows that her appointment as sole managing conservator is in the best interest of the child.

7

**Applicable Law**

In determining conservatorship, the best interest of the child shall be the primary consideration. TEX. FAM. CODE ANN. § 153.002 (Vernon 2002). The trial court has wide latitude in determining the best interest of a child, and the decision of the trial court will be reversed only when it appears from the record as a whole that the court has abused its discretion. *Marriage of Stein*, 153 S.W.3d 485, 488 (Tex. App.–Amarillo 2004, no pet.).

Unless a trial court finds that appointment of the parents would not be in the best interest of the child because the appointment would significantly impair the child's physical health or emotional development, both parents shall be appointed as joint managing conservators of the child. TEX. FAM. CODE ANN. § 153.131(a) (Vernon 2002). It is a rebuttable presumption that the appointment of the parents of a child as joint managing conservators is in the best interest of the child. TEX. FAM. CODE ANN. § 153.131(b) (Vernon 2002). A rebuttable presumption "shift[s] the burden of producing evidence to the party against whom it operates." *In re Rodriguez*, 940 S.W.2d 265, 271 (Tex. App.–San Antonio 1997, writ denied) (citing *General Motors Corp. v. Saenz*, 873 S.W.2d 353, 359 (Tex. 1993)). Once that burden is discharged and evidence contradicting the presumption has been offered, the presumption disappears and is not weighed or treated as evidence. *General Motors Corp.*, 873 S.W.2d at 359. The evidence on the issue is then evaluated as it would be in any other case. *Id.*

The parent requesting appointment as sole managing conservator has the burden to rebut the presumption. *Lide v. Lide*. 116 S.W.3d 147, 152 (Tex. App.–El Paso 2003, no pet.). In determining whether the party succeeded, an appellate court must review the following factors: (1) whether the physical, psychological, or emotional needs and development of the child will benefit from the appointment of joint managing conservators; (2) the ability of the parents to give first priority to the welfare of the child and reach shared decisions in the child's best interest; (3) whether each parent can encourage and accept a positive relationship between the child and the other parent; (4) whether both parents participated in child rearing before the filing of the suit; (5) the geographical proximity of the parents' residences; and (6) any other relevant factor. *Id.* (citing TEX. FAM. CODE ANN. § 153.134(a) (Vernon 2002)).

8

**Analysis**

At the conclusion of the evidence, the trial court found that appointing Ruth as sole managing conservator was "mandatory." Yakov was appointed possessory conservator. Because Ruth requested appointment as sole managing conservator, we review the *Lide* factors to determine if she met her burden to rebut the presumption that the appointment of both parents as joint managing conservators is in the best interest of the child. *See id.*

*Benefits to the child*

Neither party testified that R.E.E. would benefit from their appointment as joint managing conservators. However, appointment of the parties as joint managing conservators is presumed to be in R.E.E.'s best interest. Therefore, this lack of evidence is not contrary to the presumption.

*Shared decision-making ability*

Yakov testified that he disagreed with Ruth's decision to enroll R.E.E. in the Bullard schools. Further, he objected to R.E.E.'s earning an allowance, or as he stated, a "reward for chores," and informed Ruth that he thought she was teaching their child to love money. Yakov stated that Ruth objected to R.E.E.'s having any pets. Ruth testified that Yakov objected to R.E.E.'s dressing herself because he wanted to dress her even though she was almost seven years old. This evidence shows that the parties had difficulty sharing parenting decisions and therefore is contrary to the presumption of joint managing conservatorship.

*Ability to encourage a positive relationship*

Although Ruth invited Yakov to attend the International Day program with R.E.E.'s Brownie troop, he refused. In a December 2005 email admitted at trial, he described Ruth as a "snake" and stated that she had "nerve to even think I would attend any function [she] ran." Further, he alleged that selling Girl Scout cookies cost him money and a driving record. He explained that Ruth chose to schedule R.E.E. to sell Girl Scout cookies on his birthday weekend instead of allowing her to spend time with him. In April 2005, Ruth offered him time with R.E.E. on his birthday. He admitted stating in an email that the offer was "to[o] little to[o] late," and that he had his own plans with friends. Yakov admitted being frustrated and that R.E.E. would have liked to see him on his birthday. Yakov also admitted that Ruth offered him visitation with R.E.E. on Christmas Day, which he rejected. According to Yakov, Ruth was a hypocrite because she began attending a lot more

9

Friday night services after they separated. He also stated in an email at trial that he did not want "favors" from Ruth or her attorney. Yakov did not believe R.E.E. would have enjoyed seeing him unless they had an evening together for a Hanukkah party.

LaurieAnn Frank, a licensed master social worker and advanced clinical practitioner, stated that she assessed R.E.E. and had seven counseling sessions with the child. According to Frank, she had not found any alienation by one parent toward the other parent. However, Frank testified that in the session the week before trial, R.E.E. stated that everything was going to be "okay" because the judge had decided she would live with her father.

Thomas G. Allen, a psychologist, was appointed by the trial court to conduct a custodial and visitation evaluation of both parents and met their child. Allen testified that Yakov's profile was invalid because he was so defensive and, in fact, much more so than was typical in family cases. He stated that Yakov was very critical of Ruth, including her breast feeding. He also stated that Yakov tended to use guilt as a tool to manipulate and control people and in order to deal with stressful situations. Regarding Yakov's behavior, Allen believed that Yakov was being overly controlling when he refused visitation with R.E.E. on the first day of Hanukkah, which occurred on Christmas Day. He stated that Yakov chose to create an issue, was too defensive about Judaism, and was being overly critical.

Although it appears that Ruth attempted to encourage a positive relationship between Yakov and R.E.E., Yakov turned down opportunities to spend more time with his child and was openly hostile to Ruth and any positive outreaches she made to him for the benefit of his relationship with R.E.E. This evidence is contrary to the presumption of joint managing conservatorship.

*Child rearing participation before suit*

The parties did not testify regarding their participation in rearing R.E.E. before commencement of the suit. Debbie Markowitz, a co-adminstrator for the Tyler Jewish Sunday School, testified that she had known Ruth for eight years. According to Markowitz, Ruth and R.E.E. have a close relationship and Ruth brought R.E.E. to Hebrew classes, Sunday school, and synagogue. She stated that she rarely saw Yakov at synagogue and also stated that he was not active. Beth Hill, a member of the board of the synagogue where Ruth attends and R.E.E.'s Hebrew teacher, stated that she has known Ruth and R.E.E. for approximately three years. She stated that R.E.E. regularly

10

attended lessons and that Ruth signed her homework assignments. Before commencement of the suit, she saw Ruth at morning services. Hill also stated that she had seen Yakov interacting with R.E.E. at the synagogue on a few occasions. She believed that Ruth should be appointed sole managing conservator. From this evidence, we cannot determine the extent to which the parties participated in rearing R.E.E. before commencement of the suit. Therefore, this factor neither supports nor contradicts the presumption.

*Geographical proximity*

At the time of the suit, Ruth and R.E.E. lived in Troup, Texas. Yakov was living in a trailer on a friend's property in Henderson, Texas, a distance of approximately twenty miles. The parties' proximity is not contrary to the presumption.

*Other relevant factors*

Ruth testified that Yakov made decisions regarding R.E.E. that concerned her, including putting R.E.E.'s picture on an internet website. Further, she stated that Yakov would not give R.E.E. her prescription allergy medicine because he did not believe she needed it. Yakov testified that he believed Ruth made inappropriate parenting decisions, including refusing to supplement breast feeding causing the child to be hospitalized. He believed it was "clear negligence" by Ruth. Further, he stated that in August 1998, Ruth knew she tended to become dizzy very easily, but held R.E.E. by a swimming pool and spun around. He stated that they both fell into the water and that he had to jump in and pull them out.

Frank stated that R.E.E.'s Hebrew teacher noticed anger outbursts, low self esteem, and "interaction with peers"[1] after the separation. In Frank's opinion, these were normal reactions for a child whose parents were going through a divorce. According to Allen, he was concerned with Yakov's emotionality, which was impairing a calm, rational overview of what was best for R.E.E. He was quick to become tearful and upset, a not uncommon way to displace guilt onto a child. Allen recommended that Ruth have sole managing conservatorship. This evidence is contrary to the presumption.

---

[1] Frank did not explain the meaning of "interaction with peers" in her testimony.

11

*Conclusion*

The evidence shows that both parties showed an inability to share parenting decisions, that Yakov was openly hostile to Ruth, that he turned down opportunities to visit his child, that he was too emotional, defensive, manipulative, and controlling as a parent, and that he made several ill-advised decisions as a parent, including putting R.E.E.'s picture on an internet website. Although the record also includes evidence that is not contrary to the presumption, on balance, we conclude that Ruth met her burden to rebut the presumption that appointment of both parents as joint managing conservator was in R.E.E.'s best interest. The portion of Yakov's third issue that relates to Ruth's appointment of sole managing conservator is overruled.

## STANDARD POSSESSION ORDER

As part of his third issue, Yakov argues that the trial court abused its discretion by failing to order possession according to the standard possession order. He argues that there is insufficient evidence to rebut the presumption that the standard possession order provides reasonable minimum possession by a parent appointed possessory conservator.

**Applicable Law**

In determining possession of and access to the child, the best interest of the child shall be the primary consideration. TEX. FAM. CODE ANN. § 153.002. There is a rebuttable presumption that the standard possession order provides reasonable minimum possession of a child by a parent named as a possessory conservator and is in the best interest of the child. TEX. FAM. CODE ANN. § 153.252 (Vernon 2002). The trial court shall render an order that grants periods of possession of the child as similar as possible to those provided by the standard possession order if the standard order is unworkable or inappropriate. TEX. FAM. CODE ANN. § 153.253 (Vernon 2002). In ordering the terms of possession of a child under an order other than a standard possession order, the court shall be guided by the guidelines established by the standard possession order and may consider the age, developmental status, circumstances, needs, and best interests of the child; the circumstances of the managing conservator and of the parent named as a possessory conservator; and any other relevant factor. TEX. FAM. CODE ANN. § 153.256 (Vernon 2002).

**Analysis**

At the conclusion of evidence, the trial court determined that Ruth's parenting plan was in the best interest of the child. However, in the divorce decree, the trial court found that unsupervised visitation was not in the best interest of the child and ordered that Yakov's sole access to R.E.E. be through Kids Konnection and that telephone access be denied until further order of the trial court. It noted that "credible evidence" had been presented of a potential risk of international abduction of R.E.E. by Yakov because he lacked financial reasons to stay in the United States, was unemployed, and had strong familial, emotional, or cultural ties to Israel. We review the guidelines from the Texas Family Code to determine if the evidence showed that the standard possession order was unworkable or inappropriate and not in the best interest of the child. *See* TEX. FAM. CODE ANN. §§ 153.253, 153.256.

*Age, developmental status, circumstances, and needs of the child*

Ruth testified that she offered a parenting plan to the trial court granting Yakov visitation for five or six additional Jewish holidays. According to Ruth, R.E.E. is a healthy child who loves both parents. However, she was concerned that most of Yakov's visits with R.E.E. appear to be sitting in a car watching movies and that the child changes clothes in the back seat of the car. Further, Ruth stated that she had seen Yakov driving with the dashboard television on.

Yakov testified that during visits, he and R.E.E. sometimes go to the lake and frequently watch movies in his car. Yakov was aware that R.E.E. tells people she is worried about him because he does not have a place to live, enough food to eat, or a job. He agreed that it was not normal for a child to worry about her father. Regarding Yakov's and R.E.E.'s visits, Allen stated that watching movies in a car would be confining and that a parent-child relationship should not revolve around just watching movies. According to Frank, R.E.E. stated that, during visitation with Yakov, they watch movies in a car either at the lake or at the Dairy Queen parking lot. R.E.E. also stated that they eat meat and cheese sandwiches and that they have a good time. In Frank's opinion, such activities show no creativity in dealing with the child, no relationship with the child, and no parenting of the child. She was concerned because watching movies seemed to be the only activity. R.E.E. mentioned that Yakov brought a puppy to their visits and that, on one occasion, they visited some other children.

13

Markowitz stated that Yakov contributed at temple, including "leading services," and that R.E.E. had been with him at temple. Hill stated that she had seen Yakov interacting with R.E.E. at the synagogue on a few occasions. Sheila Alexander, a teacher at Bullard Middle School, testified that she teaches with Ruth and has known her for almost six years. She stated that Yakov attended her son's birthday party with R.E.E., but did not interact with her. She recommended that Ruth be the "primary" possessory conservator of R.E.E.

From this evidence, the trial court could have determined that R.E.E.'s visits with Yakov did not meet her developmental status or needs.

*The best interest of the child*

Yakov denied telling R.E.E. not to tell Ruth when they have fun or that a dog bit her. However, he admitted saying "something" to R.E.E. because, if Ruth found out about the dog incident, she would prevent R.E.E. from having contact with a pet she liked. Allen did not have enough information to assess whether Yakov was at risk for violence in the future. Hill stated that in the fall of 2005, R.E.E. told her that she was bitten by a dog during a visit with Yakov. R.E.E. also told Hill that Yakov asked her to keep the incident a secret from Ruth because if she told her mother, Ruth would not let her be around a dog again. Hill was concerned that R.E.E. had a secret with Yakov and said that it was "very inappropriate."

Ruth testified that she was concerned about Yakov's anger issues and his using guilt to manipulate R.E.E. She referred to Yakov as an "emotional" bully. She was also concerned that R.E.E. said she had secrets with Yakov, including knowing that birds were coming to the house, and that she should not inform Ruth when she and Yakov had fun or what they were doing. Ruth testified that during telephone calls between Yakov and R.E.E., she could hear Yakov grilling the child because she did not return a telephone call or did not call him. She also stated that Yakov had called after 9:00 o'clock in the evening.

From this evidence, the trial court could have determined that Yakov's asking R.E.E. to keep secrets from Ruth, including her being bitten by a dog, was not in her best interest. Further, the trial court could have found that Yakov's anger toward and manipulation of R.E.E. was not in her best interest.

14

*Ruth's circumstances*

Yakov stated that R.E.E. remains in Ruth's classroom until she finishes work, sometimes past six o'clock in the evening. Ruth testified that she teaches at Bullard Middle School, but that she does not stay until six o'clock every evening. She did not believe it was detrimental for R.E.E. to ride the school bus from the elementary school to the middle school. She stated that she took R.E.E. to Hebrew lessons, swimming and dance lessons, horseback riding, and gymnastics.

Allen stated that Ruth provided a valid profile. Although Ruth showed elevations on two scales, he stated that those elevations tend to occur in persons experiencing a lot of tension and stress. However, Allen testified that there was nothing in Ruth's tests indicating alcohol or abuse problems, personality disorders, or a significant mental illness that would impair her parental judgment. He believed that Ruth was the primary parent. Alexander admitted that R.E.E. had friends in Bullard because she attended school there. In fact, Alexander stated that it was common for children of elementary schoolteachers to attend the school where their parents teach. Alexander stated that after school, R.E.E does homework, but admitted that her homework could be done with Yakov if she were home. Both Hill and Markowitz testified that Ruth and R.E.E. attend Sunday school and synagogue regularly.

From this evidence, the trial court could have determined that Ruth parented in an appropriate manner, was active in the synagogue and in R.E.E.'s life, and was R.E.E.'s primary parent.

*Yakov's circumstances*

Yakov testified that in April 2006 he would be retired under social security and would have time for R.E.E. so that she would not need to go to babysitters after school or wait at school in Ruth's classroom until she left work. Ruth testified that R.E.E. was worried about Yakov's not having a place to live, food to eat, or a job. She did not believe it was appropriate for the child to worry about her father in this manner.

Ruth did not believe overnight visitation between R.E.E. and Yakov was appropriate until he had employment for twelve months, had an adequate residence with utilities and working plumbing for twelve months, and had undergone individual counseling for twelve months. She also wanted his telephone calls limited. According to Allen, Yakov told him that he was living in a trailer or fifth wheel parked next to a friend's house. He believed Yakov had electricity, but no water or

15

toilet facilities. Allen was concerned that Yakov did not have adequate housing arrangements for the child and no place that she could be safe, comfortable, and sanitary.

From this evidence, the trial court could have determined that Yakov's visitation and access to R.E.E. should be limited, especially considering his lack of adequate housing.

*Any other relevant factor*

Ruth stated that she was awarded the temporary and exclusive use of the marital residence, but that Yakov frequently entered the property without her permission. According to Ruth, Yakov also went inside the residence, leaving bills, mail, or flowers and sometimes taking possessions. Ruth testified that Yakov threatened her, stating that if she had the "audacity" to go into the office at the marital residence, he would break into the house. Yakov admitted entering the marital residence numerous times after Ruth was awarded exclusive rights to that residence in the temporary orders. He also admitted writing a note to Ruth in which he stated that if she broke into his office again, he would "get into the house."

Yakov admitted during trial that he had planned before the suit to live in Israel with his siblings. Allen could not predict whether Yakov might abduct R.E.E. to Israel. According to Allen, Yakov's family and support structure was in Israel and, thus, he was concerned that Yakov would leave the country with R.E.E. After the trial, Yakov wrote an ex parte letter to the trial court. In the first paragraph of the letter, he stated that he resented the implication that Ruth made about the "Israel" connection. He stated that "this country is plenty big to get lost in for years if one wishes to do so. It will take only hours to get to the woods." As a result of that letter, Ruth moved for, and was granted, an ex parte order to suspend possession and access. Thus, the trial court could have determined that Yakov violated its temporary orders on numerous occasions and that there was a risk that he might abduct R.E.E. to Israel.

*Conclusion*

The evidence shows that Yakov lacked adequate housing or employment, that his visits with R.E.E. demonstrated a lack of awareness of her developmental status or needs, that he was manipulative and inappropriate with R.E.E., including requesting that she keep secrets from Ruth regarding their visits, that he violated the trial court's temporary orders, and that there was a risk, however small, that Yakov might attempt to abduct R.E.E. to Israel. On the other hand, the evidence

16

showed that Ruth had stable employment and appeared to have a close, appropriate relationship with R.E.E. Based upon our review of the record, we conclude that the trial court did not abuse its discretion in ordering terms of possession that differed from the guidelines established by the standard possession order. *See* TEX. FAM. CODE ANN. § 153.256. Accordingly, the portion of Yakov's third issue that relates to his possession of and access to R.E.E. is overruled.

## CHILD SUPPORT

In his fourth issue, Yakov contends that the trial court abused its discretion in assessing his child support obligation. More specifically, he argues that the only evidence in the records established his income at $768.00 a month and that the child support ordered by the court, $266.68 per month, is more than provided for by the child support guidelines. Ruth contends that Yakov presented no evidence relating to his net resources nor did he request any findings from the trial court or complain to the trial court about its failure to make certain findings. Moreover, she argues that Yakov failed to object and, thus, failed to preserve error regarding his child support.

**Applicable Law**

For purposes of determining child support liability, the trial court shall calculate net resources, including all wage and salary income and other compensation for personal services, interest, dividends, and royalty income, self-employment income, net rental income, and all other income actually being received. TEX. FAM. CODE ANN. § 154.062(a), (b) (Vernon 2002). The duty to support a child is not limited to a parent's ability to pay from current earnings, but also extends to his or her financial ability to pay from any and all sources that might be available. ***In re Striegler***, 915 S.W.2d 629, 638 (Tex. App.–Amarillo 1996, writ denied) ; ***Roosth v. Roosth***, 889 S.W.2d 445, 455 (Tex. App.–Houston [14th Dist.] 1994, writ denied); ***Musick v. Musick***, 590 S.W.2d 582, 586 (Tex. Civ. App.–Tyler 1979, no writ). In rendering an order for child support, the trial court shall make findings if (1) a party files a written request with the trial court not later than ten days after the date of the hearing, (2) a party makes an oral request in open court during the hearing, or (3) the amount of child support ordered by the trial court varies from the amount computed by applying the percentage guidelines. TEX. FAM. CODE ANN. § 154.130(a) (Vernon 2002). A trial court's failure to make these findings upon a timely or proper request or variance constitutes reversible error.

17

*Hanna v. Hanna*, 813 S.W.2d 626, 628 (Tex. App.–Houston (1st Dist.) 1991, no writ).

**Analysis**

At trial, Yakov testified that he has a degree in electrical engineering as well as a master of business administration degree. He also stated that his current income was zero. In April 2006, he would begin receiving monthly benefits from social security in the amount of $728.00 a month. Yakov admitted that he and his brother-in-law began a family business that included over three million dollars in assets. His reported income to the Internal Revenue Service was included as part of the business income. However, Yakov stated that he did not take a salary from the business, but, instead, retained all of his assets in a trust. Although Ruth appears to argue that Yakov was intentionally underemployed or unemployed, there was no evidence at trial to support this argument.

Ruth requested that Yakov's child support be based on a monthly income of $1,800.00 per month, which would require him to pay $266.00 per month in child support. However, Ruth presented no evidence showing how she arrived at Yakov's alleged monthly income. In the absence of evidence of the wage and salary income of a party, the trial court shall presume that the party has wages or salary equal to the federal minimum wage for a forty hour week. TEX. FAM. CODE ANN. § 154.068 (Vernon 2002). Under the Texas Family Code, the net monthly income of an employed person earning the federal minimum wage of $5.15 per hour is $805.53.[2] *See* TEX. FAM. CODE ANN. § 154.061 (Vernon Supp. 2006). According to the child support guidelines, the amount of child support for one child should be twenty percent of Yakov's net monthly resources or, based on the federal minimum wage of $5.15 per hour, $160.69 per month. *See id.* § 154.125 (Vernon 2002). The amount ordered by the trial court, $266.68 a month, is above these guidelines.

Further, if the trial court based Yakov's child support on his social security benefits of $728.00 a month, the trial court was required to determine the amount of child support that would be ordered under the child support guidelines and subtract from that total the amount of benefits or the value of the benefits paid to or for the child as a result of Yakov's receipt of social security old age benefits. *See* TEX. FAM. CODE ANN. § 154.133 (Vernon 2002). There is no evidence that the trial court determined Yakov's child support based upon his social security benefits.

The amount of Yakov's child support ordered by the trial court varies from the amount calculated according to child support guidelines. Thus, the trial court was required, even without

---

[2] Because the trial court assessed Yakov's child support obligation in 2006, we use the Texas Family Code's 2006 tax chart for employed persons to determine the correct federal minimum wage.

a timely and proper request from Yakov, to make findings and state whether the application of the guidelines would be unjust or inappropriate. *See* TEX. FAM. CODE ANN. § 154.130(a), (b). By failing to make the findings, the trial court prevented Yakov from effectively contesting the trial court's deviation from the child support guidelines. *See **Tenery v. Tenery***, 932 S.W.2d 29, 30 (Tex. 1996). Therefore, the trial court abused its discretion by deviating from the child support guidelines without making the required findings. Accordingly, Yakov's fourth issue is sustained.

## CONCLUSION

Having sustained a portion of Yakov's first issue and his second and fourth issues, we ***reverse*** the portion of the trial court's judgment awarding Ruth a greater portion of the proceeds of the marital residence to compensate her for the $6,983.26 reimbursement claim and ***remand*** to the trial court to determine the distribution of the net proceeds from the sale of the marital residence. Further, we ***reverse*** the portion of the trial court's judgment ordering Yakov to pay $266.68 per month in child support and ***remand*** to the trial court to render child support orders in compliance with the statutory child support guidelines or issue findings explaining its variance. In all other respects, the trial court's ***judgment*** is ***affirmed***.

**JAMES T. WORTHEN**
Chief Justice

Opinion delivered June 11, 2008.
*Panel consisted of Worthen, C.J., Griffith, J., and Hoyle, J.*

(PUBLISH)