

# Fourth Court of Appeals
## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-11-00807-CV

Gerardo Perez **NIETO**,
Appellant

v.

Veronica Flores De Perez **NIETO**,
Appellee

From the 45th Judicial District Court, Bexar County, Texas
Trial Court No. 2009-CI-15813
Honorable Barbara Hanson Nellermoe, Judge Presiding

Opinion by:    Sandee Bryan Marion, Justice

Sitting:    Karen Angelini, Justice
Sandee Bryan Marion, Justice
Patricia O. Alvarez, Justice

Delivered and Filed:  May 1, 2013

AFFIRMED

This appeal arises out of a divorce proceeding between Luis Gerardo Perez Nieto and Veronica Flores Garza Nieto.  In nine issues on appeal, appellant, Gerardo, asserts the trial court erred (1) by failing to make complete and accurate findings of fact and conclusions of law; (2) by exercising jurisdiction over the parties when the parties did not meet the domiciliary and residency requirements of Texas Family Code section 6.301; (3) by addressing appellant's separate property claims by submitting separate property questions to the jury and by ordering appellant to vest title to previously sold real property to appellee; (4) in allowing a valuation

expert to testify contrary to the *Daubert* and *Robinson* standards; (5) in the property division by dividing non-existent assets and overvalued assets; (6) by dividing the property contrary to the jury verdict; (7) in permitting a post-verdict non-jury trial on newly discovered evidence when a jury trial had been demanded; (8) in awarding post-verdict and post-divorce maintenance to appellee; and (9) by not awarding child support from the date the jury rendered its verdict. We affirm.

## BACKGROUND

The parties, Mexican citizens, were married on December 7, 1991, in Mexico. Veronica filed for divorce in Bexar County on September 25, 2009. Prior to their marriage, the parties secured a marriage application in Mexico that included an "Agreement of Separate Properties." According to expert testimony presented post-trial, at the time a couple obtains a marriage license in Mexico they can decide whether they want the marriage under a community property regime or a separate property regime. The information indicating the parties agreed to a separate property regime was printed on the marriage application, which was signed by both parties before a notary public.

There is one child of the marriage, a son, who was fifteen years old at the time of trial. Their son attended private school in San Antonio for six years and was attending public school in San Antonio at the time of the divorce.

Gerardo testified he received close to one million dollars in inheritance from his family before the parties were married. Gerardo does not work, but invests his money to make a profit. Veronica obtained a business degree in 1981, but testified she has not worked since the parties were married.

The parties testified they both spent time during their marriage traveling between Mexico and the United States. The parties owned a house in San Antonio, but were here in the United

States pursuant to an investment visa. Gerardo invested in a business called "COSI" in two different locations—one in Austin (Sunset Valley), one in San Antonio (Rim). According to testimony, Gerardo lost his investment in COSI Sunset Valley when a judgment was entered against the company and the business was forced to close. However, COSI Rim was still in business and Gerardo continued to be an investor with his friend and business partner, Agustin Zurita. Testimony was presented at trial that Gerardo had loaned money to Zurita, secured by several promissory notes. Gerardo testified there were three notes and asserted all the Zurita notes had been paid in full prior to the filing of the divorce, but Veronica asserted Zurita owed Gerardo on some of the notes.

The jury determined the characterization of the properties at issue as follows:

San Antonio home — 100% community property
COSI Rim interest — 50% separate property of Gerardo, 50% community
COSI Sunset Valley interest — 50% separate property of Gerardo, 50% community
Zurita loans — 50% separate property of Gerardo, 50% community
Mexican apartment — 50% separate property of Gerardo, 50% community

After the jury verdict, the trial court heard evidence to determine valuation and how to divide the assets in accordance with the jury's characterization determinations. During post-verdict hearings, evidence was presented that there were more than three Zurita notes and that Zurita still owed on some of them. Expert testimony was heard on Mexican law (regarding the marriage application and the separate/community determination), and on the value of Gerardo's interest in COSI Rim. The final decree of divorce was signed on August 15, 2011. Following the entry of the divorce decree, Gerardo requested findings of fact and conclusions of law. The trial court entered its findings of fact and conclusions of law and Gerardo made a request for additional findings, which the trial court denied. This appeal followed.

**FINDINGS AND CONCLUSIONS**

In his first issue, Gerardo argues the trial court erred by failing to make complete and accurate findings of fact and conclusions of law. Rule 298 of the Texas Rules of Civil Procedure provides that a trial court shall file any additional findings of fact and conclusions of law that are appropriate within ten days after the request is filed. TEX. R. CIV. P. 298. If a court fails to provide the additional findings, reversal is not required if the complaining party did not suffer injury. *City of San Antonio v. El Dorado Amusement Co., Inc.*, 195 S.W.3d 238, 243–44 (Tex. App.—San Antonio 2006, pet. denied). "If the trial court's refusal to make additional findings does not prevent an adequate presentation on appeal, there is no reversible error." *Id*. at 244. An appellant is prevented from making an adequate presentation on appeal if he is forced to guess at the reasons for the trial court's decisions. *Id*.

Gerardo's complaint is that the following thirteen of his seventeen requests were denied by the trial court, thus leaving him to guess at the trial court's reasons on those issues and preventing him from an adequate presentation on appeal.

*What facts and legal authority permitted the Court to exercise jurisdiction over the parties when the parties resided in Mexico and did not maintain residency in Mexico and did not maintain residency in Texas or Bexar County for the requisite period prior to the petition for divorce being filed?*

> The trial court specifically addressed this on page four of its findings:
>
> C. The trial court reviewed the pleadings of both Petitioner and Respondent and found that all the jurisdictional prerequisites had been fully satisfied without objection by either party. The court further found that this Court has jurisdiction of the parties, of the child, and of the subject matter of this case, in that the child and the Petitioner and Respondent had resided in San Antonio, Bexar County, Texas for at least 6 months prior to the filing of the Petition for Divorce, and the parties owned the marital residence and conducted business in San Antonio, Texas. All legal prerequisites to granting a divorce and entering orders for the interest of the minor child have been met.

*By what legal authority did the Court find the Mexican prenuptial agreement as invalid, illegal or otherwise unenforceable?*

The trial court specifically addressed this on page seven of its findings:

P. The trial court, after reviewing the documents entered into evidence by both Petitioner and Respondent and testimony of both parties' expert witnesses on remaining issues, to include the testimony of the parties, subsequently found that a dispute existed as to whether or not a prenuptial agreement existed between the parties. The court found that no such agreement existed between the parties.

*What competent and admissible evidence was presented to the Court that permitted a finding the Mexican prenuptial agreement was invalid, illegal or otherwise unenforceable?*

As stated above, after reviewing the documents and the testimony of both parties and the expert witnesses regarding the marriage contract/alleged prenuptial agreement, the court found such agreement did not exist. The court also detailed the evidence upon which it relied in finding that the agreement did not exist.

*What facts and legal authority permitted the Court to exercise jurisdiction of the separate property of Gerardo Perez Nieto in Mexico?*

The court specifically made a finding that there was no prenuptial agreement in existence. Therefore, in accordance with the jury's verdict that the Mexican apartment was 50% community and 50% separate, the court ordered it sold because the property could not be partitioned. The jury did not find the apartment was 100% Gerardo's separate property.

*What facts and legal authority permitted the Court to submit jury questions concerning community property when the parties married in Mexico and created a prenuptial agreement which was ratified by Mexican legal authority?*

Again, the trial court found there was no valid prenuptial agreement in existence.

*What competent and admissible evidence permitted the finding that the property inherited by Gerardo Perez Nieto was community property?*

Gerardo does not direct us to which property he is alleging was "inherited." However, the jury determined the community property/separate property nature of all property at issue. The trial court addressed this on page four of its findings:

D. Based on the testimony of Respondent and Petitioner, to include the testimony of the various experts called by both parties, and further the documents entered into evidence by the trial court, the jury found and the trial court subsequently found that all property acquired during the marriage of the parties to be presumed community property unless that party wishing to establish a claim for separate property, offered evidence, under the standard of clear and convincing evidence, to rebut the community property presumptions . . . .

The finding then lists all of the property at issue and the community/separate determination of each. Implicit in this finding is that the jury determined Gerardo did not meet his burden of showing, by clear and convincing evidence, that all of the property was his sole separate property by way of inheritance.

*What competent evidence was presented to the Court to demonstrate Gerardo Perez Nieto ever possessed community property?*

Again, implicit in the jury's finding that a portion of the property was community is that Gerardo did not meet his burden, by clear and convincing evidence, that the property was his separate property. The presumption is that all property possessed by a husband or wife is community at the time the marriage is dissolved. *See Tarver v. Tarver*, 394 S.W.2d 780, 783 (Tex. 1965).

*How was the expert opinion of Gene Trevino admissible under* Daubert*?*

The trial court addressed this issue on page five of its findings:

E. Dr. Gene Trevino, Petitioner's expert witness in the valuation of [Gerardo's] interest in the business commonly known as COSI-Rim, was sworn in by the court and testified, without objection or without challenging the witness under *Daubert*.

The trial court found that appellant waived his *Daubert* objection.

*What valuation did the Court attribute to COSI?*

The trial court addressed this issue on page five of its findings:

F. The value placed on [Gerardo's] interest in the business commonly known as COSI-Rim was $237,214.00, based on the credible testimony of Dr. Gene Trevino

- 6 -

and deducting the unexplained advance payments received by Respondent from the business partnership in the amount of $195,737.00.

It is clear the trial court valued Gerardo's interest in COSI Rim at $237,214.00.

*In the face of evidence by the payor and payee, that all notes were paid and evidenced by notes with "PAID" written on the original notes, what competent/admissible evidence did the Court find to establish the Zurita notes had not been paid?*

The trial court addressed this issue on page five and six of its findings:

H. At issue were various unsecured promissory notes in which Respondent's business partner personally borrowed from Respondent, $810,000.00 during the marriage. The documents and bank statements entered into evidence and the fact that the court strongly questioned the veracity and credibility of Respondent's testimony as to quantity and the payments made to Respondent by Respondent's business partner on the various promissory notes, resulted in the trial court finding the following; Only three promissory notes were disclosed to the court during the jury trial totaling $650,000.00, and subsequently two additional promissory notes or loans were disclosed to the trial court, in the amount of $100,000.00 and $60,000.00 respectively. Even though Respondent testified that "all loans" had been paid in full, evidence was offered to the trial court, that there was a remaining unpaid balance on the first three promissory notes in the amount of $120,122.00 and $160,000.00 remaining on the two subsequent loans.

This finding demonstrates the trial court, relying on "documents and bank statements entered into evidence" and on the trial court's credibility determination of Gerardo's testimony, found there was a remaining unpaid balance.

*What income of [Gerardo] did the Court find existed and how did the Court base its award of post-divorce spousal support?*

The trial court specifically addressed this issue on page six of its findings:

J. The Income of [Gerardo] was determined from the facts surrounding Respondent's ability to maintain his lifestyle and daily living arrangements to include his business interest in COSI-Rim and the payments from the promissory notes identified above.

In the next finding, the trial court listed the factors that justified the award of post-divorce spousal support to Veronica including: her financial resources, the education and employment

skills of both parties, the duration of the marriage, the earning ability of the parties, acts by either spouse of concealment or fraud, and the comparative financial resources of the spouses.

*What factors justified the award of post-divorce spousal support to Veronica Flores de Perez Nieto?*

As stated above, the trial court listed in its finding the factors the trial court considered in determining the award of post-divorce spousal support to Veronica.

*After not presenting issues to the jury on the Zurita notes, what authority permitted the Court to divide "newly discovered assets" instead of requesting Petitioner to submit the issues to a jury via a new trial, the same never being requested by Petitioner?*

The trial court addressed this issue in a finding on page seven:

O. Both parties submitted the remaining issues, not otherwise resolved by the jury, to the trial court, without objection.

We conclude all the requests Gerardo describes as "omitted" from the trial court's findings of fact and conclusions of law were addressed. Accordingly, we do not believe Gerardo has been forced to guess at the reasons for the trial court's decisions; therefore, he was not prevented from an adequate presentation on appeal.

## JURISDICTION

In his second issue, Gerardo asserts the trial court erred in exercising jurisdiction over the parties when the parties did not meet the domiciliary and residency requirements of Texas Family Code section 6.031.

Family Code section 6.301 provides: "A suit for divorce may not be maintained in this state unless at the time the suit is filed either the petitioner or the respondent has been: (1) a domiciliary of this state for the preceding six-month period; and (2) a resident of the county in which the suit is filed for the preceding 90-day period." TEX. FAM. CODE ANN. § 6.301 (West 2006). "Section 6.301 . . . is akin to a jurisdictional provision in that it controls a party's right to maintain a suit for divorce and is a mandatory requirement that the parties cannot waive." *Palau*

*v. Sanchez*, No. 03-08-00136-CV, 2010 WL 4595705, at *5 (Tex. App.—Austin Nov. 10, 2010, pet. denied) (mem. op.). "[S]ection 6.301 requires only that a petitioner be a domiciliary of Texas and a resident of the county in which the suit is filed, not that she be a citizen of the United States or carry a certain type of visa." *Id.* at *6. Domiciliary is defined as "[a] person who resides in a particular place with the intention of making it a principal place of abode." *Black's Law Dictionary* 524 (8th ed. 2004). Residence is defined as "[t]he place where one actually lives, as distinguished from a domicile." *Id*. at 1335.

"[S]ection 6.301's requirements of domicile and residence are a fact issue for the trial court to determine, which will not be disturbed unless there is a clear abuse of discretion." *Griffith v. Griffith*, 341 S.W.3d 43, 53 (Tex. App.—San Antonio 2011, no pet.). With respect to factual matters, an abuse of discretion occurs if the record establishes the trial court could reasonably have reached only one decision. *McAlister v. McAlister*, 75 S.W.3d 481, 484 (Tex. App.—San Antonio 2002, pet. denied).

At the hearing on Gerardo's motion to dismiss for lack of jurisdiction on December 8, 2009, the court heard the following evidence. The parties were both Mexican nationals in the United States on investment visas. The visas were effective for three years, subject to a renewal. Gerardo applied for the investment visa, and his wife and son were here pursuant to Gerardo's investment visa. The parties were married in Mexico and they owned a residence in Mexico. The parties also owned a home in Bexar County that was purchased five years prior to filing for divorce. The parties had a fifteen-year-old son who had attended private schools in San Antonio for six years. For the year preceding the divorce filing, their son was attending a public school in San Antonio.

Veronica testified that she and Gerardo stayed at the home in Mexico during summer vacation, for Christmas, or to visit family. Veronica testified her residence was in San Antonio

and the home in Mexico was a "vacation home." Veronica stated it was her intent to establish a domicile in Texas and her son intended to finish high school in Texas. Veronica agreed she was in the United States on an investment visa and that she had not filed for permanent resident alien status for either herself or for her son. However, Veronica also testified it was not her intention to return to Mexico and she would only be returning to Mexico to visit family or for vacation.

On the other hand, Gerardo testified their home was in Mexico and the San Antonio residence was their vacation home. Although the trial court heard conflicting testimony, as the sole judge of the credibility of the witnesses, we conclude the trial court did not abuse its discretion in finding the requirements of Family Code section 6.031 were satisfied.

**JURY CHARGE AND PREVIOUSLY SOLD REAL PROPERTY**

In his third issue, Gerardo contends the trial court erred "in addressing [his] separate property claims by submitting separate property questions to the jury and by ordering [him] to vest title to previously sold real property to [Veronica]." It appears this issue is divided into two parts: First, a complaint that the jury charge was erroneous in submitting separate property questions to the jury. Second, a complaint that the trial court erred in ordering appellant to vest title to "previously sold real property" in Veronica.

**1. Jury Charge**

A complaint to a jury charge is waived unless it is specifically included in an objection. *Cruz v. Andrews Restoration, Inc.*, 364 S.W.3d 817, 829 (Tex. 2012); *see* TEX. R. APP. P. 33.1(a). "A party objecting to a charge must point out distinctly the objectionable matter and the grounds of the objection. Any complaint as to a question, definition, or instruction, on account of any . . . omission . . . is waived unless specifically included in the objections." TEX. R. CIV. P. 274. The inquiry focuses on whether the trial court was aware of the problem, thus giving the trial court the opportunity to remedy it. *Cruz*, 364 S.W.3d at 829.

At the close of evidence Gerardo moved for directed verdict. The record indicates there was an "informal jury charge conference" off the record. Gerardo filed a proposed jury charge, stating it was "submitted after the informal jury conference and while the Court's ruling is pending on [Gerardo's] motion for judgment." Gerardo's proposed jury charge contained a single question asking the jury to determine "[w]hat percentage, if any, of the following items are the separate property of Gerardo Perez Nieto and what percentage, if any, is the community property of the parties," followed by the five assets at issue. Gerardo's proposed charge had for each asset two lines, one for a separate property determination and one for a community property determination to total 100%. There were no objections on the record before the charge was read to the jury. The charge actually submitted to the jury contained the same paragraph in Gerardo's proposed jury charge with two lines for each asset for the jury to enter its determination of what percentage of each asset was community and separate.

Gerardo asserted at oral argument the following language, attached to his proposed jury charge, preserved his right to appeal the trial court's submission of separate property questions to the jury:

> . . . The proposed charge is submitted after informal jury conference and while the Court's ruling is pending on Respondent's motion for judgment. Respondent reserves his rights to seek additional or revised instructions as warranted after the Court's rulings. . . .

We conclude this language did not preserve Gerardo's complaint about the submission of a separate property question. First, the language he points us to only refers to the right to "seek additional or revised *instructions*." We may not construe that language to be an objection to an erroneously submitted question. *See* TEX. R. CIV. P. 274 ("No objection to one part of the charge may be adopted and applied to any other part of the charge by reference only."). Second, Gerardo's proposed charge included a question requiring the jury to make both a separate and

community property determination for each asset, which appears to be the same question ultimately submitted to the jury.

## 2. Previously sold real property

In this issue, Gerardo contends the trial court erred in ordering him to vest title in previously sold real property in Veronica. Because the only "previously sold real property" in this case was the "Tabachines" house [1] in Cuernavaca, Mexico, we construe his argument in this issue as limited to this property. At trial, there was testimony from Gerardo that he sold the "Tabachines" house five years earlier. He introduced into evidence the sales agreement as proof he sold the house. However, Veronica asserted the property was still in Gerardo's name according to a document she recently discovered. Veronica's trial counsel questioned Gerardo as follows:

> Q:    Okay. Let's talk about the house in Cuernavaca, Mexico. Now, there is a house that you say you sold; is that correct?
> A:    Yes.
> Q:    Okay. And how long ago did you sell it?
> A:    It's around five years ago.
> Q:    Okay. And you told Ms. Veronica Nieto that you had sold it; is that correct?
> A:    Yeah, she witnessed the house was sold.
> Q:    Can you tell us why, sir, there is still a document in the records of Mexico in their courts that say you own this house still? Can you explain that to us, please?
> A:    Yes. I will try to.
> Q:    Okay.
> A:    The house was sold, and I have an agreement contract, a sales agreement. And the house has been notarized by a public notary in Mexico, but the buyer, he's not been able to pay for closing. That is why — one of the reasons the house is still under my name.
> Q:    So it has not been processed correctly or it — there's still something —
> A:    It's been processed correctly. The house is under his name. In public records it's still in my name. But the house, it belongs to him, and I have a public notary that can testify to that.

The property came up again later during redirect examination:

> Q:    And the house that is in Cuernavaca, Mexico, okay you're following me?
> A:    Yes.

---

[1] This was a different property than the Mexican "apartment" in Cuernavaca.

Q: That one still has not been changed and you said you sold it five years ago, correct?

A: Yes.

Q: And you are telling this Court under oath that that does not exist anymore; is that correct?

A: Yes. That's correct. I sold the house, and I would be under penalty to go to jail if it's not so.

Q: Okay. But that's not what I asked you. Now, what I'm asking you is, it's already been done; there's nothing else?

A: It's a deal done, and it's just a matter of the purchaser to pay the closing costs to the public notary, and the house is already in his name.

Q: Okay. So it's already done. Now, sir, you're under oath, correct?

A: Yes.

Q: If the house is not there, if it does not exist, but your wife finds out that it does later, are you willing to give her that house outright?

A: Right at that moment.

Q: Right at that moment.

A: Right at that moment.

Gerardo testified on the record, under oath, that he would give his interest, if any, in the house in Cuernavaca to Veronica if it were discovered he had not sold the house as he claimed. During a hearing after the jury trial, Gerardo's trial counsel again reasserted that Gerardo was willing to give his interest in the Cuernavaca house to Veronica should there not be a sale:

> So I have to stand on the proposition that the property in Cuernavaca is his separate property. As we did in San Antonio, you know, fairness is give her something, and we did. Fairness is help her out, and we did. If she believes Tabachines really is an asset that he's hiding, I have no problem that she do what she already did in January last year, and she can go down into Mexico and say, I want to enforce my husband's rights on the property which he has assigned to me, and here is a sworn document, a certified copy of Judge Nellermoe's order giving me all right, title, and interest that he has in Tabachines. She can go and take that. You know, hundreds of thousands of dollars, take it. We don't want it.

During closing arguments to the trial court at the end of the post-verdict hearings, Gerardo's counsel again stated:

> . . . And when they talk about Tabachines, and that that — my client says it's sold. You know what, if he's wrong, if he lied, give it to her. By agreement, we can put in the order that he hereby assigns all right, title and interest that he has in the property in Tabachines worth $400,000 and she can go have it. Just go take it. That's all there is to it. He's not lying, Judge.

The final divorce decree reflected Gerardo's statements at trial and post-trial and awarded Veronica 100% interest, if any, in the house located in Cuernavaca, Mexico. The final divorce decree reflects what Gerardo agreed to in open court and on the record. Based on the foregoing, we conclude Gerardo agreed to vest the interest, if any, in the Tabachines house in Veronica and he cannot now complain on appeal that the trial court "ordered" him to do so.

## VALUATION EXPERT

In his fourth issue, Gerardo complains the trial court erred by allowing a valuation expert to testify contrary to the *Daubert* and *Robinson* standards. Specifically, Gerardo asserts on appeal the expert testimony of Dr. Gene Trevino was "inadmissible as it was based on faulty methodology applied to the wrong valuation method rendering the opinion unreliable and . . . the testimony is conclusory, speculative and non-probative on its face."

To preserve error for appeal, a party must present to the trial court a timely objection, state the specific grounds therefore, and obtain a ruling that appears in the record. TEX. R. APP. P. 33.1(a); *see Wal-Mart Stores, Inc. v. McKenzie*, 997 S.W.2d 278, 280 (Tex. 1999).

Upon the offer of Trevino's valuation report (Petitioner's Exhibit 10), Gerardo's trial counsel stated:

> Your Honor, I have had an opportunity to review Petitioner's Exhibit No. 10, which includes a reference to a very nice Robinson and Daubert article written by Dr. Trevino. I do not believe Dr. Trevino's testimony today will meet the Daubert standard; however, I believe it's important for the Court to consider his report in order to jump that hurdle. So for those purposes, I have no objection to Plaintiff's Exhibit No. 10 being admitted into evidence.

This was the only "objection" made to Dr. Trevino's testimony and to his valuation report. Gerardo did not renew it at any point during the testimony or after the testimony and he did not obtain a ruling on any objection. Accordingly, we must conclude Gerardo has not preserved this complaint for appellate review.

**DIVISION OF ASSETS**

In his fifth issue, Gerardo asserts "the trial court erred in the property division by dividing non-existent assets and overvalued assets." We construe Gerardo's challenge to the valuation of COSI Rim as an "overvalued asset," and the unpaid Zurita notes as "non-existent assets." As to the Zurita notes, it appears Gerardo challenges the trial court's finding that (1) there were more than three Zurita notes, and (2) there was still an unpaid balance on some of the Zurita notes.[2] As to the COSI Rim interest, it appears Gerardo argues (1) the valuation of his interest should have been based on his valuation expert rather than Trevino's valuation, and (2) his interest was overvalued, resulting in a skewed division of the community estate by increasing his share of the estate.

## 1.  Zurita notes

We construe Gerardo's argument to be a no-evidence challenge to the trial court's finding that there were five notes, and to the trial court's finding that there remained an unpaid balance on some of the notes.

At the jury trial, Gerardo testified there were only three Zurita notes and all were paid in full. In post-verdict hearings, however, evidence was presented that there were two additional Zurita notes and Gerardo conceded a fourth and fifth note existed. Veronica's counsel questioned Gerardo regarding notes four and five at the post-verdict hearing:

> Q:     Now, the summary that Mr. Zurita's attorney gave us comes up with note number four. How much was that?
> A:     $100,000.
> Q:     And the summary from Mr. Zurita comes up with a note number five. How much was that for?
> A:     $60,000.
> Q:     Do you have any reason to believe that Mr. Zurita would be mistaken in his relationship with you and him as it relates to the lending and borrowing of money?

---

[2] Gerardo does not challenge the value of the unpaid notes. Therefore, if we find there was evidence to support the trial court's finding that there were five Zurita notes and that some of the notes were unpaid, we will not address whether $280,122.00 was a proper valuation of the unpaid balance of those notes because Gerardo does not challenge that value.

A:     No.
Q:     That this is a fair and accurate representation of the money you, in fact, gave him?
A:     It should be accurate.  I have my own copies.
Q:     Oh, good.  Okay.  So you're not disputing this summary?
A:     I'm not going to dispute it.

Gerardo's bank statements and Zurita's payment and transfer summaries were entered into evidence in addition to the documents provided by Zurita's attorney.  Veronica's counsel questioned Gerardo as to repayment of the notes:

Q:     Okay.  We have no documentation that shows —
A:     No.
Q:     — note number four and note number five have been paid.  You have no proof that those have been paid?
A:     I know that they were paid.
Q:     But you have up until today only represented to the Court that there were three promissory notes and you have no representation to the Court, no documents, no spreadsheet, no accounting, no bank statements that show that $160,000 has been paid?
A:     I have my own bank statements.  I know that money came back to my account.
Q:     We're not disputing that $529,000 was given back.  But you, today, after all this time still have not admitted until just now that there are two other notes in existence.  And you still do not have any documentation or evidence today that proves these have been paid off, but your business partner is showing that they were in existence.  Is that true?
A:     I don't understand the question.
Q:     Simple.  Do you have any documents that show that these, note four and note five, have been paid off today?
A:     My bank statements.
Q:     Where on your bank statements?
A:     Should speak by itself.
Q:     Where in your bank statements do these two notes reflect they've been paid?
A:     He didn't pay $100,000 and $60,000.  He paid, you know, different amounts.
Q:     Where in his statements does it show that these two notes were paid off under his subpoena?
A:     I don't know.  I don't know.
Q:     They don't reflect, do they?  Okay.  What they do reflect is, from Mr. Zurita's subpoenaed documents, that there are still two outstanding notes and that payments of $529,878 were paid against the $650,000, leaving — if we do the math — a payment owed to you by Mr. Zurita of $120,000.  He owes you, by the pure math and by the documents before the Court, an asset, a contingent asset, but an asset that your business partner still owes you personally $120,000 based on the evidence before the

Court, not to mention an additional explanation as to the $160,000. Do you understand that?

A:     No.

Gerardo testified to the totals of notes four and five, and stated on the record that he did not dispute either the amount or their existence. The spreadsheet attached to the findings of fact and conclusions of law shows $160,000 was owed on notes four and five and $120,122 was still owed on the first three notes. We conclude there is sufficient evidence to support the trial court's finding that $280,122.00 remained unpaid on the Zurita notes.

## 2.  COSI Rim interest[3]

Gerardo asserts the trial court overvalued his interest in COSI Rim and "[t]he valuation of Gary Weinman should have been accepted by the trial court." During post-verdict hearings, Gerardo presented the testimony of Weinman and Veronica presented the testimony of Trevino. The two experts testified to what they determined was the value of Gerardo's interest in COSI Rim. The trial court relied on Trevino's valuation in its division of the estate.

Trevino's conclusion in his valuation report stated:

> After performing the analysis, Mr. Gerardo Perez-Nieto's interest in Z&P Rim Food Company, LP had a fair value of $41,476 January 1, 2011. If the $195,737 in capital contributions and distributions are not considered, then the fair value of Mr. Gerardo Perez-Nieto's interest would be $237,214.

According to testimony, during Trevino's inquiry into the value of Gerardo's interest in COSI Rim, it was discovered there was a capital contribution to Gerardo's partnership account that was subsequently withdrawn. Describing this "capital distribution" and its effect on Gerardo's interest, Trevino was questioned as follows:

> Q:     Okay. Now, I'm seeing below that this distribution to [Gerardo] from the COSI accounts, correct, in the amount of $195,737.23?

---

[3] Only COSI Rim was valued because Gerardo's interest in COSI Sunset Valley was lost when the restaurant was forced to close. COSI Rim, however, remained in business.

A:      Yes.  You can see where that — that amount of money was basically put in there by Augustin [sic] Zurita and it was subsequently withdrawn, the exact amount, by [Gerardo].

Q:      So I'm clear, this wasn't from profits necessarily or revenues derived up by COSI's operation.  If I understand this exhibit, Mr. Zurita deposited sometime in 2009 and 2010 an amount of $195,737.23; is that right?

A:      Yes.

Q:      Mr. Zurita did.  And then [Gerardo] withdrew the like amount, correct?

A:      That's correct.

Q:      And the consequence of that action did what?

A:      Well, obviously he had a capital account of 237,000.  He withdrew 195,000 from the partnership.  So that left him with only 41,000 in his capital account and it took his interest down to five and a quarter percent from over 40 percent.  It basically had the — had the effect of diluting his interest or significantly reducing the value of his capital account because he withdrew a lot of money from the partnership.

Trevino stated the COSI accountant, Ms. Farmer, "really didn't have any background as to what that $195,000 was for," and the money just "went in and went out."  He further stated she "was dumbfounded about the whole thing herself.  And she had no plausible explanation for it.  She just said it is what it is.  Basically, money Mr. Zurita put in the partnership and money [Gerardo] withdrew."   In arriving at his valuation, Trevino stated "[s]o if you disregard [the capital distribution] because it had no business purpose, then the value would be $237,000 prior to this contribution and subsequent withdrawal."  Trevino's testimony helped clarify what he meant:

Q:      What would have been the value of his business had Mr. Zurita not, as you used, conduited, if you will, the funds to Mr. Nieto?

A:      Well, the value of his capital account would have been $237,000.

Q:      And what percentage of his interest in [COSI] would that have been?

A:      About 40 and a half percent.

Q:      So if I understand what you're saying, but for the $195,000 that one individual gave to another individual, his value, Mr. Nieto's interest in [COSI], would be about 40 percent?

A:      Yes.

                                   . . .

Q:      Any other consequence — besides the dissolution of [Gerardo's] interest, is there any other consequence, other than that sole consequence in reference to the $195,000 transfer and withdrawal?

A:      Well, that and [Gerardo] is able to recover a large part of his investment by withdrawing it from the partnership.

Q:    So you were here today and he gave testimony as you recall that he received no contribution, distributions, dividends.  I think I said deferred compensation or commissions from the operation of COSI Rim.  Were you here when he said that?
A:    Yes.
Q:    Okay.  But, in fact, the records show that in 2009, first part of 2010, not all that long ago, with all due respect, [Gerardo] did, in fact receive cumulatively 195,000; is that right?
A:    Yes.  According to his accountant, yes.

The divorce decree awards to Gerardo his "membership interest in and to the restaurant business" in COSI Rim as his sole and separate property.  The divorce decree also awards, in a separate paragraph, "[t]he proceeds from the cash advance from COSI to [Gerardo] in the approximate amount of $195,000.00."  The spreadsheet in the findings of fact and conclusions of law demonstrating the value of each asset and how that asset was divided for purposes of the divorce decree and judgment values Gerardo's interest in COSI Rim at $237,214.00 and then adds, as a separate asset, the $195,737.00 in capital contributions and distributions.  It is apparent the trial court, based on the testimony presented, concluded the value of Gerardo's interest in COSI Rim was $237,214 and, due to the unexplained absence of the "capital contributions" that the accountant found were distributed to Gerardo, decided to value the advance as a separate asset.  "The trial court, in evaluating the community assets, may blend all of the evidence and fix a value on property anywhere within the range of the testimony."  *McIntyre v. McIntyre*, 722 S.W.2d 533, 536 (Tex. App.—San Antonio 1986, no writ).  Because evidence was presented that an unexplained advance had occurred and that, but for the advance, Gerardo's interest in COSI was valued at $237,214.00, we conclude the trial court did not abuse its discretion in arriving at its valuation of Gerardo's COSI interest and in determining the advance of $195,000 should be considered a separate asset.

**PROPERTY DIVISION**

In his sixth issue, Gerardo argues the trial court erred by dividing the property in a fashion contrary to the jury verdict. The jury verdict determined the community/separate property characterization of the assets as follows:

> San Antonio home — 100% community property
> COSI Rim interest — 50% separate property of Gerardo, 50% community
> COSI Sunset Valley interest — 50% separate property of Gerardo, 50% community
> Zurita loans — 50% separate property of Gerardo, 50% community
> Mexican apartment — 50% separate property of Gerardo, 50% community

We review a trial court's division of the estate of the parties for an abuse of discretion. *Murff v. Murff*, 615 S.W.2d 696, 698 (Tex. 1981). To constitute an abuse of discretion, the property division must be manifestly unfair. *O'Carolan v. Hopper*, 71 S.W.3d 529, 532 (Tex. App.—Austin 2002, no pet.). The trial court is not required to divide the estate equally, but must do so in an equitable manner. *Zieba v. Martin*, 928 S.W.2d 782, 790 (Tex. App.—Houston [14th Dist.] 1996, no writ); *see* TEX. FAM. CODE ANN. § 7.001 (West 2006). The trial court has wide discretion and can take many factors into consideration in making a just and right division of the community property. *Schlueter v. Schlueter*, 975 S.W.2d 584, 589 (Tex. 1998). However, the trial court has no discretion to divest a spouse of separate property. *Eggemeyer v. Eggemeyer*, 554 S.W.2d 137, 141–42 (Tex. 1977). In making a division, the trial court may disregard a jury's suggestion as to the division of the property, but may not disregard the jury's findings as to the status or characterization of the property as separate or community. *See Cockerham v. Cockerham*, 527 S.W.2d 162, 173 (Tex. 1975) ("Though the trial court has wide discretion in dividing the property of the spouses as it feels just and in disregarding advisory answers of the jury, it may not ignore the jury's answers which extend to issues of fact from which the status of property is determined."). The trial court may award a monetary judgment to one spouse to

accomplish a just and right division. *Hanson v. Hanson*, 672 S.W.2d 274, 278 (Tex. App.—Houston [14th Dist.] 1984, writ dism'd).

The San Antonio home, which the jury determined was 100% community property, had been sold and the proceeds divided before the divorce decree was signed. Therefore, in accordance with the jury's verdict, all of the remaining properties subject to division were found to be 50% separate property of Gerardo and 50% community property.

In reference to the assets the jury determined the characterization of, the divorce decree reflects the following: Gerardo received, as his sole and separate property, the COSI assets and the remaining balances on the three unpaid Zurita notes. Veronica was awarded 100% of the *community* property interest in the Mexican apartment and a monetary judgment to "equalize the division of the marital estate and liability awarded to the respective parties." Comparing the divorce decree to the jury's property determinations, it is apparent the trial court did not divide the property "in a fashion contrary to the jury verdict." Accordingly, the trial court did not err in its property division.

In his complaint about the property division, Gerardo also asserts that all the assets were his separate property and the trial court erred in divesting him of his separate property by dividing the assets. He argues that because the parties were married in Mexico we must accept Mexican law and, therefore, he does not have any burden to establish his property was separate and does not have to utilize any "tracing" principles to demonstrate his property was separate. We reject this argument.

Gerardo concedes he has no case law to support his argument that he has no burden to demonstrate the property was separate because the parties were married in Mexico. We likewise find no support and we decline to apply such an approach. The divorce was filed in Texas and the trial court found the parties met the domiciliary and residence requirements of Family Code section 6.301. Therefore, we will apply Texas Law. Under Texas law, all property possessed at the dissolution of

marriage is presumed to be community. *See* TEX. FAM. CODE ANN. § 3.003 (West 2006); *Garza v. Garza*, 217 S.W.3d 538, 548 (Tex. App.—San Antonio 2006, no pet.). "To overcome this presumption, a party must present clear and convincing evidence that the property is separate." *Garza*, 217 S.W.3d at 548. The party asserting the property is separate must trace and clearly identify what property he claims is separate. *Id.* Mere testimony that property is separate, without any tracing of the funds, is insufficient to rebut the community presumption. *Id.* Gerardo argues his testimony that the property was separate, along with his inventory filed with the trial court, was sufficient to demonstrate the property was his separate property. However, following Texas law, Gerardo had the burden of presenting clear and convincing evidence that all assets were his separate property, and we conclude he did not satisfy his burden.

## NEWLY DISCOVERED EVIDENCE

In this issue, Gerardo asserts the trial court erred in permitting a post-verdict, nonjury trial on newly discovered evidence when a jury trial had been demanded. Gerardo argues he "complied with all requirements for asking the jury to determine the separate property character of disputed assets" and after the jury verdict Veronica "asked the trial court to consider matters Gerardo requested a jury consider." He contends this is error.

It appears Gerardo is relying on his original jury request. After reviewing the record, we cannot find where an objection was raised below. The trial court's findings of fact and conclusions of law reflect: "Both parties submitted the remaining issues, not otherwise resolved by the jury, to the trial court, without objection." Therefore, we conclude this argument was not preserved for appeal because Gerardo made no objection to the trial court hearing the evidence after the jury trial. *See* TEX. R. APP. P. 33.1 (requiring a party to preserve complaints for review by objecting and obtaining a ruling).

## SPOUSAL MAINTENANCE

In this issue Gerardo asserts the trial court erred in awarding post-divorce spousal maintenance to Veronica.

A court may award spousal maintenance when the duration of a marriage was ten years or longer and the spouse seeking maintenance: (1) lacks sufficient property to provide for the spouse's minimum reasonable needs; and (2) lacks earning ability to earn sufficient income to provide for the spouse's minimum reasonable needs. TEX. FAM. CODE ANN. § 8.051 (West 2006). We review the trial court's decision to award spousal maintenance under an abuse of discretion standard. *Diaz v. Diaz*, 350 S.W.3d 251, 254 (Tex. App.—San Antonio 2011, pet. denied). The trial court does not abuse its discretion if there is some evidence of a substantive and probative character to support the decision or if reasonable minds could differ as to the result. *Id*.

The parties were married nearly twenty years. Veronica testified she received a college degree prior to her marriage to Gerardo, but she has not worked since they married. Veronica was a stay at home wife and mother to their son for the entire duration of their marriage. Veronica testified she had no income as she was here under Gerardo's investment visa and was not allowed to work in the United States pursuant to that visa. Veronica was also recovering from breast cancer. Excluding the monetary judgment from Gerardo, Veronica was awarded 100% of the community property interest in the real property referred to as the "Mexican apartment," a vehicle, and the funds in the USAA bank account valued at $1,000. Additionally, Veronica was awarded approximately $17,000 in debt. The trial court granted spousal maintenance of $2,500 per month, but limited the maintenance to three years or until the monetary judgment entered against Gerardo is collected, whichever is shorter. Based on the

foregoing, we conclude the trial court did not abuse its discretion in granting the spousal support to Veronica.

## RETROACTIVE CHILD SUPPORT

In his final issue, Gerardo argues the trial court erred by not awarding child support from the date the jury rendered its verdict.

The award of child support is in the best interest of the child and is not intended to be punitive in nature. *Garza v. Blanton*, 55 S.W.3d 708, 711 (Tex. App.—Corpus Christi 2001, no pet.). The decision to award retroactive child support is within the broad discretion of the trial court. *Nordstrom v. Nordstrom*, 965 S.W.2d 575, 582 (Tex. App.—Houston [1st Dist.] 1997, pet. denied). An abuse of discretion occurs when the court reaches a decision that is "arbitrary and unreasonable" or "without reference to any guiding rules and principles." *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985).

The trial court ordered Veronica to pay child support in the amount of $250 per month starting the date the divorce decree was signed. Upon Gerardo's request for retroactive child support the trial court stated:

> I'm not inclined to do that because Mr. Nieto had not paid her temporary child support — temporary spousal support even though I had ordered it several times, and clearly ordered it several times. I'm going to not grant retro. I'm going to grant starting the day that we sign the decree. The date of the decree, it starts.

We conclude the trial court's decision to deny retroactive child support was supported by a reasonable explanation and was, therefore, not an abuse of discretion.

## CONCLUSION

Based on the foregoing, the trial court's judgment is affirmed.

Sandee Bryan Marion, Justice